Filed 5/12/25  Bartel v. Chicago Title Insurance Company CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| RICHARD BARTEL,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CHICAGO TITLE INSURANCE COMPANY,<br><br>    Defendant and Appellant. | H052083<br>(Santa Cruz County<br> Super. Ct. No. 16CV02814) |

This title insurance action centers on the scope of an insurer's duty to defend a policy holder in litigation when it is not clear whether the policy covers the underlying dispute.

Plaintiff Richard Bartel bought a property in rural Santa Cruz County to enjoy a quiet retirement.  The property was so rural that no public roads connected to it.  Bartel accessed the nearest public road by using a private road that traversed the property of his neighbors to the west.  Bartel believed the private road terminated at his western property line.  However, Bartel's neighbor to the east believed he, too, had access to the private road using a route that crossed Bartel's property.

This disagreement became acute when the property of the eastern neighbor became a site for marijuana cultivation, serviced by trucks driving through Bartel's property during the night. Bartel installed security devices and informed his easterly neighbor that he had no right to cross Bartel's property.

Bartel's neighbor twice brought suit against Bartel, asserting a right to use the private road that crossed Bartel's property. The neighbor dismissed both suits without prejudice. The trucks continued driving by Bartel's house, and Bartel in turn brought suit against his neighbor to quiet title. The neighbor cross-complained, alleging a right to an easement over the private road crossing Bartel's property. The matter eventually went to trial. It resulted in a judgment (affirmed on appeal in this court) that the neighbor had an express easement over the private road through Bartel's property, based on a deed executed at the time the properties were subdivided in 1971. (See *Bartel v. Composti* (Aug. 15, 2019, H044464) [nonpub. opn.]).)[1]

Bartel largely self-funded the litigation against his neighbor using money from his retirement account. Chicago Title Insurance Company—the issuer of a title insurance policy Bartel purchased when he bought the property in 1998—rejected Bartel's tender for defense in the suits brought by his neighbor. Chicago Title asserted it had no duty to defend Bartel because of exclusions in his title insurance policy–one of which was general (carving out easements not recorded in a public deed) and one of which was specific (carving out claims arising from a 1970 agreement among the neighbors

---

[1] On this court's own motion, we take judicial notice of the record and the opinion in *Bartel v. Composti*, *supra*, H044464. (See Evid. Code, §§ 459, subd. (a); 451, subd. (a), 452, subd. (d); *Linda Vista Village San Diego Homeowners Assn., Inc. v. Tecolote Investors, LLC* (2015) 234 Cal.App.4th 166, 185.)

about road maintenance)—and because the complaint allegations against Bartel denied there was a deeded easement.

Bartel disagreed with Chicago Title's decision and continued to seek tender based on his title insurance. Chicago Title eventually determined that it *did* have a duty to defend Bartel, but only after five years of litigation between Bartel and his neighbor. Moreover, Chicago Title asserted its duty to defend Bartel arose when the neighbor filed his cross-complaint, and it had no duty as to the earlier litigation.

Bartel brought suit against Chicago Title for breach of contract and breach of the covenant of good faith and fair dealing. The dispute between Bartel and Chicago Title went to trial in two phases. In the first phase, the trial court rejected Chicago Title's statute of limitations defense and held that the insurer had a duty to defend Bartel as of his initial tender of defense. In the second phase, the court rejected certain claims by Bartel for damages for periods outside the litigation but awarded additional damages for the diminution in value of Bartel's property. The court further found that although Chicago Title could have performed its duties better and more expeditiously in response to Bartel's tender requests, it did not act in bad faith.

On appeal, Bartel challenges the trial court's rejection of his bad faith claim and request for punitive damages, argues the court erred in denying reimbursement of his litigation costs and attorney fees for the period between actions in the underlying litigation, and asserts the court awarded inadequate prejudgment interest.

In its cross-appeal, Chicago Title asserts that the trial court erred both in finding it had a duty to defend the easement claim as of the date of Bartel's

3

first tender and in applying equitable tolling to reject Chicago Title's statute of limitations defense.

For the reasons explained below, we agree with Bartel that the trial court erred in its finding that Chicago Title did not act in bad faith. We reject all other claims raised by both parties and remand for further proceedings.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. *The Underlying Litigation*

The properties at issue belong to a seven-lot subdivision in rural Aptos, described in detail in *Bartel v. Composti, supra,* H044464. In 1998, Bartel obtained a title insurance policy from Chicago Title when he purchased his parcel, described as Assessor's Parcel No. (APN) 105-511-6 ("the property" or "parcel No. 6"), accessed by a private road now known as "Pax Place Court." The title insurance policy included a "schedule B," titled "Exceptions from Coverage." (Some capitalization & boldface omitted.) In relevant part, schedule B stated, "This policy does not insure against loss or damage (and the Company will not pay costs, attorney's fees or expenses) which arise by reason of: [¶] . . . '[E]asements, liens or encumbrances, or claims thereof, which are not shown by the public record[]' [and] 'a road maintenance agreement' " (capitalization & italics omitted) recorded on September 2, 1970 (and subsequent amendments).

When Bartel and his wife[2] purchased parcel No. 6, they were looking to retire to a property that was "private, end of road" and "quiet." They believed

_____

[2] Bartel purchased the property and obtained the title insurance policy with his then-wife, Patricia Bartel. After Patricia's death, Bartel married Stok and executed a 2004 grant deed granting Stok a one-half community property interest in the property. Bartel no longer owns the property, which

4

the property, which is accessed via a private road (Fern Flat Road) that intersects "Pax Place Court" (another private road, which at the time Bartel purchased the parcel was an unnamed road), was "an end-of-road property, and nobody had the right to go by." The closest public county road is about five miles from Fern Flat Road.

Rod Composti and Patrice Edwards (together, Composti) owned properties APN 105-511-08 (parcel No. 8) and APN 105-511-09 (parcel No. 9) located directly to the east of Bartel's parcel. Although the then-unnamed Pax Place Court continued through parcel No. 6 to provide access to parcel Nos. 8 and 9, Bartel believed that no one to the east of parcel No. 6 had a legal right to use the road. For the first few years Bartel owned the parcel, only a few people used the Pax Place road.

In or about 2005, Bartel began noticing increased foot and vehicle traffic along Pax Place, passing directly in front of his house and occurring during the night. Bartel learned that the increased traffic was associated with a marijuana grow on the nearby Composti property. Traffic continued to increase to the point that Bartel considered it a nuisance and installed security devices on his property.

### 1. Composti's First Complaint (Composti I)

On May 25, 2010, Composti filed a verified complaint in the Santa Cruz County Superior Court against Bartel, Stok, and other neighbors, initiating the underlying litigation. (*Composti v. Maciel, et al.* (Super. Ct. Santa Cruz County, 2010, No. CV167646). We refer to this first action as "Composti I."

The complaint in Composti I asserted causes of action for quiet title to easement; declaratory and injunctive relief; slander of title and breach of

he sold in 2021. Stok was a party to the underlying litigation but is not a party to this appeal.

5

contract. Composti sought to quiet title to an easement in his favor over a road referred to as "Lower Road"[3] which the complaint alleged "crosses the lands" of Bartel and Stok. The complaint alleged a right-of-way easement benefiting Composti's parcel, established by a recorded map attached to a "Right of Way and Joint Maintenance Agreement" recorded on September 2, 1970 (1970 agreement) and burdening several of the neighboring parcels. Alternatively, the Composti I complaint alleged other theories of easement, including easement by prescriptive use.

The Composti I complaint did *not* allege a deeded easement pertaining to the properties and appeared to expressly deny that possibility. It stated, in the underlined heading to paragraph 11 (which discussed the right of ways "grounded on the contract" executed by the prior owners of the parcels subject to the 1970 agreement), that "Neither Parcel has Deeded Easement" (underscoring omitted). Nevertheless, the Composti I complaint attached several exhibits, including Exhibit G, referred to by the parties as the "Boyd-Sluyter deed." The Boyd-Sluyter deed is a 1971 recorded deed granting title of the land that was later subdivided into parcel Nos. 6 and 7 and providing for a 40-foot right-of-way "over an existing road" (further described therein). Exhibit G bears a handwritten notation to the description of the right-of-way reservation, which reads "Entire Lower Road" and lists property owners including "Bartel, Stok." The Boyd-Sluyter deed is the deed that would later

[3] In later correspondence, Composti's counsel clarified that the allegations as to "Lower Road" in the Composti I complaint in fact referred to "the 'middle' road" (later renamed "Pax Place Court"). Bartel testified at trial that although both parties knew there were three roads (sometimes referred to as "upper road," "middle road," and "lower road") associated with the Bartel and Composti parcels, the Composti complaint confused matters by referencing only two roads, corresponding to the recorded map attached to the 1970 agreement.

6

serve as the basis of the judgment in the underlying litigation that confirmed that Composti held an express easement over Pax Place Court through Bartel's property.

Bartel obtained a copy of the Composti I complaint, which had not yet been served on him, and retained counsel. By letter dated March 18, 2011, Bartel's counsel tendered defense of the Composti I matter to Chicago Title. The tender of claim referred to Composti's asserted prescriptive easement and attached a copy of the Composti I complaint, noting that Bartel and Stok were named as defendants but had not been served with the lawsuit. On April 6, 2011, Chicago Title sent an acknowledgement of the claim, stating it had been assigned to claims counsel for investigation and administration, and assigned it a claim number.

In May 2011, Chicago Title's claims counsel exchanged e-mails with Bartel's counsel confirming that Bartel had not yet been served with the complaint. For reasons that are not clear from the record, on June 23, 2011, Composti dismissed his complaint without prejudice.

### 2. Composti's Second Complaint (Composti II)

Approximately two weeks later, on July 8, 2011, Composti filed a new action naming the same defendants and asserting the same claim to an easement over Bartel's property. (*Composti v. Maciel, et al.* (Super. Ct. Santa Cruz County, 2011, No. CV171562.) We refer to this second action as "Composti II." The complaint in Composti II was identical to the complaint in Composti I. It, too, attached a copy of the Boyd-Sluyter deed as Exhibit G and similarly appeared to deny any deeded easement by asserting in the heading to paragraph 11 that "neither parcel has deeded easement" (capitalization & underscoring omitted). Bartel was served with the Composti II lawsuit.

7

By letter dated July 27, 2011, Chicago Title informed Bartel's counsel that it had completed its investigation of the claim and declined to accept tender of the defense. The letter explained its denial of coverage as based upon the express exceptions from coverage set forth in schedule B of the title insurance policy. Specifically, it stated that " 'Lower Road' " identified in the Composti II complaint is "one of the roads affected by the" 1970 agreement and thus "excepted from coverage under [s]chedule B, [p]art II, Exception 5."[4]

The letter stated that the other theories in the complaint (i.e., prescriptive use) were also excluded from coverage under "[s]chedule B, [p]art I, Exception 3, as they would necessarily not be shown by the public records." The letter additionally explained that an insurer's duty to defend arises "if, but only if, any of the allegations against the insured could result in a judgment that the insurer would be obligated to pay." It invited Bartel to let Chicago Title know if he had information or documentation that he believed "gives rise to a covered claim."

Following Chicago Title's rejection of Bartel's tender, Bartel's counsel continued to correspond with claims counsel, urging Chicago Title to reconsider. In a letter dated August 24, 2011, Bartel pointed to incongruities between the parcel map that accompanied the policy when he received it and the allegations in Composti II, which alleged "Lower Road" to be the road subject to the easement claim and equated it with Fern Flat Road. The letter noted that the policy obtained by Bartel "reflected that Fern Flat Road did not cross [the] property. However, the [Composti c]omplaint alleges that

---

[4] Although the record on appeal does not appear to contain a tender request from Bartel for Composti II, the July 27, 2011 denial of coverage sent by Chicago Title refers to the complaint in Composti II. We infer that Bartel informed Chicago Title about the second suit, and Chicago Title considered Composti I and Composti II together when assessing coverage.

Fern Flat Road does indeed cross [the] property. Therefore, the status of the roads as provided in the title report is directly called into question by the [c]omplaint and our clients are entitled to be defended and indemnified pursuant to this policy."

Chicago Title disagreed with Bartel's interpretation of the maps and responded in a letter two days later that the Composti complaint's "obvious mistake" (misidentifying Lower Road as Fern Flat Road) "does not draw this claim into coverage."[5] Bartel again requested reconsideration, asserting that regardless of any purported mistake in the complaint, if Composti were to prevail in proving his claim, "any such judgment would be within the scope of the policy" and thus provides a "clear basis for coverage."

On September 30, 2011, Composti filed a first amended complaint for declaratory relief and quiet title (Composti II amended complaint). The Composti II amended complaint realleged that the claimed easement on the Bartel property was as described in the 1970 agreement ("by virtue of a record map attached" to the agreement) or by prescriptive rights. The amended complaint omitted the attached copy of the Boyd-Sluyter deed and the allegation that there were no express or deeded easements.

---

[5] Chicago Title's response to Bartel's request for reconsideration argued that the Composti complaint incorrectly identified the "Lower Road" as "Fern Flat Road," when (according to Chicago Title) in fact, Fern Flat Road "is a completely different road than the Lower Road" that "lies to the south of the insured property and does not pass through it." It further asserted that the "only roads that provide access to [Composti]'s property are the Lower and Upper Roads. The only road of the three (Fern Flat, Upper and Lower) that passes through the insured property is the Lower Road." By misidentifying the road passing through the property (later found to be "Pax Place Court") as the "Lower Road," Chicago Title appears to have mistakenly conflated the "Lower Road" named in the 1970 Agreement with the road at issue in the easement claim.

On October 13, 2011, Chicago Title informed Bartel of new claims counsel assigned to the matter and rejected Bartel's prior request (from September 8, 2011) for reconsideration. Focusing on the question of coverage "for the plaintiff's [Composti]'s claim of an easement by way of the Lower Road," Chicago Title deemed the issue to be covered by the 1970 agreement and therefore excepted from coverage. Bartel's counsel requested reconsideration of the denial in a letter dated November 3, 2011, which Chicago Title denied in a letter dated November 16, 2011.

On October 16, 2012, without explanation to Bartel, Composti dismissed without prejudice the Composti II amended complaint. Bartel decided he "needed to resolve" the question of easement rights because the property continued to experience "ongoing issues" as Composti "was continuing to use [Bartel's] road to support his marijuana grow."

3. Bartel's Action and Composti's Cross-complaint (Composti III)

On September 10, 2013, Bartel and Stok filed an affirmative action against Composti and Bank of America, N.A. for quiet title, nuisance, declaratory relief, and injunctive relief. (*Bartel et al. v. Composti, et al.* (Super. Ct. Santa Cruz County, 2013, No. CV177722; see *Bartel v. Composti, supra*, H044464.) Bartel alleged in paragraph No. 11 of the verified complaint that Composti had claimed an adverse interest in Bartel's property on Pax Place Court on a variety of grounds, including "that [Composti] [has a] deeded right-of-way or access across this property" and has "an easement across this property based on rights contained within" the 1970 agreement. Composti filed a verified answer to the complaint, admitting the allegations of paragraph No. 11 describing the claim of deeded access across Bartel's property.

10

On October 10, 2013, Composti filed a verified amended answer and on May 14, 2014, he filed a cross-complaint, naming, among other cross-defendants, Bartel and Stok. We refer to this third action as "Composti III."

The verified amended answer reasserted Composti's claim of an adverse interest on the grounds specified in paragraph No. 11 of the Bartel complaint. It further asserted "[e]asement by express grant" as an affirmative defense, alleging that the easement was established by the 1970 agreement and recorded "thereafter in every grant deed of [p]arcel 6, which is now known as . . . Pax Place Court." In his cross-complaint, Composti reasserted the theory of an easement over Pax Place established by the 1970 agreement and recorded in all subsequent grant deeds. Composti alleged, "all grant deeds to the described parcels from and after 1970 contained a nonexclusive easement for utilities and [r]oad which in substance describes and constitutes Pax Place Court."

In a letter dated September 5, 2014, Bartel tendered the defense of Composti III to Chicago Title and attached a copy of the cross-complaint against him and Stok. Chicago Title acknowledged receipt of the claim notice and assigned it the same claim number as the prior claims based on Composti I and Composti II.

On October 28, 2014, Chicago Title denied Bartel's tender of defense. Claims counsel reasoned that the "gravamen" of the complaint and cross-complaint concerned an easement "created under" the 1970 agreement and excepted from the policy of title insurance. In subsequent e-mail correspondence, Bartel and claims counsel continued to disagree about whether Composti's easement claim was covered by the 1970 agreement.

In January 2015, Bartel sent Chicago Title a copy of a motion for summary adjudication filed by Composti. The motion for summary

11

adjudication asserted that, apart from easement rights created by the 1970 agreement, "early conveyances" contained either reservations or grants of rights of way over Pax Place. The motion specifically cited the 1971 Boyd-Sluyter deed, noting the "grant deed of property including [p]arcel 6 to Vern Sluyter . . . reserved a [r]ight of [w]ay of 40 feet in width 'over an existing road' that describes the current location of Pax Place Court."

Chicago Title again declined to accept tender, explaining in a letter to Bartel dated January 27, 2015, that the easement described in the Boyd-Sluyter deed "was created by the" 1970 agreement. Bartel requested reconsideration and, in subsequent correspondence, argued that the road passing through parcel No. 6 was "Middle Road or Pax Place Court" and was not mentioned in the 1970 agreement.

Claims counsel for Chicago Title responded that it appeared the Boyd-Sluyter deed and 1970 agreement covered "the same area" and asked "What am I missing?" Nevertheless, claims counsel continued to investigate the claim. In a confidential internal claims report dated April 29, 2015, claims counsel wrote: "Even though the only basis for an easement alleged in the [c]ross-[c]omplaint is the excepted agreement, we still have a duty to defend based on the memorandum filed in support of [Composti]'s motion for summary judgment."

In a letter dated May 26, 2015, Chicago Title accepted tender of Bartel's defense in Composti III "as of January 19, 2015" and otherwise "st[ood] by its denial of the [t]ender for the period before January 19, 2015." Chicago Title based the date of coverage on Bartel's January 19, 2015 request for reconsideration after the filing of Composti's motion for summary adjudication. Chicago Title explained that the motion for summary adjudication was "the first time in the litigation that an additional and

12

independent basis for [Composti's] alleged easement across Pax Place Court" had been asserted based on the Boyd-Sluyter deed and reasoned that because it "alleges a potentially covered matter—an easement by virtue of the Boyd Deed—the [c]ompany accepts the [t]ender as of . . . the date the [i]nsured tendered this matter."

Bartel challenged Chicago Title's assessment, asking it to reconsider its limited acceptance of the tender. In a July 1, 2015 e-mail to claims counsel, Bartel's counsel asserted that the easement in the Boyd-Sluyter deed had been "raised earlier" in Composti I and Composti II. Bartel and Chicago Title continued to dispute the scope of coverage and amount of reimbursement due to Bartel, although Chicago Title agreed to reimburse Bartel $62,729.72 for defense costs incurred between January 19, 2015 and June 4, 2015 (when Chicago Title retained counsel to represent Bartel) and for the transfer of the case to the retained counsel.[6] Several months later, after a bench trial, the trial court issued a tentative statement of decision in favor of Composti on the easement claim, and Bartel tendered a new claim asking Chicago Title to expand its coverage.

On January 23, 2017, the trial court entered its final statement of decision and judgment in favor of Composti (Composti III judgment). The court found that the 1970 agreement and its amendments provided access rights to "Upper Road" and "Fern Flat Road" but did *not* grant any right of access across "Middle Road, now known as Pax Place Court." Nevertheless, the court found an express easement and right of access based on the 1971 Boyd-Sluyter deed along Pax Place through Bartel's property to parcel No. 9.

---

[6] Chicago Title later agreed to reimburse additional amounts related to the transfer of the case and specified expenses but rejected Bartel's requests to extend coverage prior to January 19, 2015.

It found each of the subsequently granted chains of title to parcel Nos. 6 and 9 reflected the existence and conveyance of the right-of-way. The court confirmed the 40-foot wide easement appurtenant to parcel No. 9 for ingress and egress over Pax Place, which it limited to those uses consistent with the zoning of parcel No. 9.[7]

Chicago Title thereafter accepted tender of Bartel's claim as of September 5, 2014 (extending coverage to the date Bartel tendered defense of the Composti cross-complaint). It stated, by letter dated March 9, 2017, that it "accepts coverage for the deeded easement over the Bartel property, as determined by the trial court." Chicago Title sought invoices for the period it had agreed to cover (between September 5, 2014 and January 18, 2015) and requested a report from Michael Dunn of Dunn & Associates on the diminution of value to Bartel's parcel caused by the easement. Dunn evaluated the diminution of value at $170,000 as of January 7, 2015. In a letter dated March 27, 2018, Chicago Title provided Bartel a copy of the report and included payment of $170,000.

*B. The Present Action*

On October 27, 2016, while Composti III was pending, Bartel filed a complaint against Chicago Title, initiating the case before us. The complaint alleged breach of contract and breach of the implied covenant of good faith and fair dealing. On March 1, 2018, Bartel filed an amended complaint asserting the same causes of action and seeking attorney fees, costs, and litigation expenses incurred for the defense of the claims before January 19,

---

[7] Bartel and Stok independently pursued an appeal of the judgment after Chicago Title informed Bartel that it had elected not to appeal. As noted *ante*, a panel of this court affirmed the judgment in an unpublished decision. (*Bartel v. Composti*, *supra*, H044464.)

14

2015, punitive damages, and interest. Bartel later filed (after completion of the first phase of trial) the operative, second amended complaint (complaint), adding details in support of his punitive damages claim. In its answer, Chicago Title generally denied the allegations and asserted the statute of limitations as an affirmative defense.

On February 11, 2019, the trial court entered an order based on a joint application of the parties establishing the sequence for the determination of preliminary legal issues based upon stipulated facts, including whether the statute of limitations barred any of Bartel's claims and, assuming no statute of limitations bar, whether Chicago Title had a duty to defend Bartel before September 5, 2014.[8]

The first phase of the trial addressed Chicago Title's duty to defend Bartel in Composti I and Composti II and Chicago Title's affirmative defense based on the statute of limitations. Issues reserved for the second phase of trial included Chicago Title's duty to defend during a period the parties refer to as the " 'donut hole' " period from October 16, 2012 (the dismissal of the Composti II amended complaint) to September 5, 2014 (the date Chicago Title accepted coverage of Bartel's claim under the policy). The bifurcated

---

[8] The issues identified for the phase I trial were: (1) Bartel's entitlement to reimbursement for fees and costs incurred paying for the defense of his spouse, Stok; (2) Bartel's entitlement to reimbursement under the title policy for the fees and costs of the appeal of the judgment in Composti III; (3) whether any of Bartel's claims are barred by the statute of limitations; (4) Bartel's entitlement to reimbursement for tax penalties incurred by taking early retirement withdrawals to self-fund litigation; and (5) assuming no statute of limitations bar, whether Chicago Title had a duty to defend Bartel against defense fees and costs incurred before September 5, 2014.

15

phases were tried before different bench officers due to the intervening retirement of the judge who tried phase I.

### 1. Phase I Trial

In February 2019, the trial court conducted a two-day bench trial. Both parties waived their right to jury trial and submitted the matter based on their respective trial briefs. The matter was tried on stipulated facts and joint exhibits, including a copy of the subject title insurance policy issued by Chicago Title to Bartel, dated December 23, 1998 (the policy).

On March 12, 2019, the trial court entered its interim judgment on first phase of trial (interim judgment). The court found that the duty to defend was continuing and existed as of the date of Bartel's first tender on March 18, 2011 (in relation to Composti I). The court explained that, under controlling authorities such as *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263 (*Gray*), *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287 (*Montrose*), and *Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076 (*Horace Mann*), "the bare allegations and theories in a third party's complaint against an insured do not alone control the duty to defend. The duty to defend is also triggered by extrinsic facts of which the insurer is aware, when those facts show a potential for liability under the policy." The court reasoned that the Composti III judgment, establishing the potential for liability under the policy, was based on the Boyd-Sluyter deed. That same deed "was attached to Composti's earliest iterations of his easement claim, and Chicago Title was aware of the same."

The trial court concluded that Chicago Title was liable "[a]t a minimum" for costs, fees, and interest from March 18, 2011, until October 16, 2012, and interest on fees and costs for the period beginning September 5, 2014, which Chicago Title had already reimbursed. It deferred any

16

determination of liability with respect to the period in between to the finder of fact in phase II. The court found it unnecessary to address Chicago Title's duty to conduct a reasonable investigation, noting that evidence on that issue would be relevant to the question of bad faith to be examined in the second phase of trial.

The trial court also rejected Chicago Title's statute of limitations defense. Under the equitable tolling doctrine set forth in *Lambert v. Commonwealth Land Title Ins. Co.* (1991) 53 Cal.3d 1072 (*Lambert*), the court concluded there was "no merit" to Chicago Title's contention that Composti's prior dismissals of his easement claim in Composti I and Composti II ended the equitable tolling period because those dismissals without prejudice did not constitute a final judgment on the claim. Alternatively, the court explained that even if the dismissal of Composti II on October 16, 2012 "suspended the equitable tolling period, Composti reasserted his easement claim less than two years later by way of his cross-complaint filed on May 4, 2014," thus resuming equitable tolling as of that date until the January 23, 2017 entry of judgment.

The trial court also addressed the issue of interest, holding that prejudgment interest at the rate of 10 percent was recoverable by Bartel and would be calculated during phase II, when the total amount of damages would be determined. The court rejected Bartel's claims for reimbursement pertaining to his appeal from the Composti III judgment and to the defense of his spouse, Stok, whom the court found was not an insured under the policy. The court identified the issues remaining for phase II, including whether Chicago Title owed coverage for the " 'donut hole' " period, Chicago Title's alleged bad faith, the adequacy and timeliness of the payment for diminution of value, and total damages, including potential punitive damages.

17

2. Phase II Trial

The second phase of trial proceeded before the trial court without a jury in May 2023.  Following pretrial briefing and motions in limine, the court granted Bartel's motion for trial preference based on his age and medical condition.  The parties submitted evidence, including expert witness testimony, over eight days of trial and written closing arguments.  We describe the evidence more fully where relevant to our analysis, *post*.

The trial court issued a proposed statement of decision in November 2023, to which Bartel filed objections and Chicago Title filed opposition.  In January 2024, the trial court filed a proposed judgment.  Bartel filed an objection and Chicago Title a response regarding an agreement the parties had reached on the amount of damages and prejudgment interest after phase I and disputing the application of that agreement to the amount of prejudgment interest owed under the judgment.  The court held an additional hearing to allow oral argument on the objections.

On March 5, 2024, the trial court entered a final judgment.  The judgment attached and incorporated the interim judgment and recited the findings issued by the court after phase I.  As to the issues tried in phase II, the judgment ruled in favor of Bartel on the diminution of value of the property but found in favor of Chicago Title on the issues of bad faith, damages arising from the " 'donut hole' " period, prejudgment interest, and punitive damages.  More specifically, the judgment enumerated six findings.  Four are relevant to the issues in this appeal.

As to Bartel's bad faith claim, the trial court found that although Chicago Title could have performed a more expeditious and comprehensive investigation and provided a decision to defend sooner, the insurer did not, under the circumstances, act in bad faith.  The court reasoned that claims

counsel for Chicago Title "placed an inordinate level of significance upon the Composti [c]omplaint allegations and did not perform the requisite investigation to determine if other factors existed that would confirm/support the duty to defend." At the same time, the court noted factors that made it "neither equitable, nor legally supportable, that the entire responsibility for figuring . . . out" the issues rested only with the insurer, including the difficulty in evaluating the easement claim (ultimately requiring an eight-day trial to resolve), the uncertainty among all parties concerning the location of the roads, the relationship between the Composti and Bartel properties, the significance of the Boyd- Sluyter deed, and the fact that for the first few years, the Composti complaints "plainly described matters excluded from the subject policy."

The trial court relatedly rejected Bartel's claim for punitive damages. It found that Chicago Title made errors related to the belated acceptance of the tenders to defend but that the higher burden of proof applicable to punitive damages had not been met, noting specifically that "no one knew the possible significance of the Boyd[-Sluyter] [d]eed, not even the party trying to obtain an easement, nor his counsel."

The trial court also rejected Bartel's request for damages during the " 'donut hole' " period of October 16, 2012 to September 5, 2014, finding "there was no litigation pending against the insured and no litigation to defend" because the previous lawsuit (Composti II) had been dismissed and Bartel did not notify Chicago Title of a continuing claim against the property or renew his tender for defense until the filing of the cross-complaint. As to the dispute over prejudgment interest, the court found it appropriate to award prejudgment interest on the difference between the $170,000 that Chicago Title initially paid in diminution value and the $400,000 that the court

19

ultimately decided was owed, resulting in an award of 10 percent yearly interest on $230,000, for a total of $96,284 in prejudgment interest.

The judgment awarded a total sum of $326,284 in favor of Bartel, consisting of $230,000 in additional diminution of value and $96,284 in prejudgment interest. Bartel appealed and Chicago Title cross-appealed from the judgment. The parties subsequently filed a stipulation and order amending the judgment to reflect an agreement between the parties on costs and motions to tax costs. The amended judgment awarded $287,619.52 in favor of Bartel, based on a total judgment of $333,980.62 (including pre- and postjudgment interest), less $46,361.10 in a net cost award to Chicago Title.

## II. DISCUSSION

The appeal and cross-appeal each raise several issues. We begin with the cross-appeal, which challenges the trial court's findings in phase I concerning Chicago Title's duty to defend Bartel prior to his tender of the cross-complaint in Composti III and the applicability of equitable tolling to Chicago Title's statute of limitations defense. We then turn to the issues raised in Bartel's appeal, including whether the trial court erred in failing to award damages for the " 'donut hole' " period between the underlying actions, in rejecting Bartel's bad faith claim and request for punitive damages, and in calculating the prejudgment interest owed to Bartel.

*A. Statute of Limitations*

Chicago Title contends the trial court erred in applying equitable tolling to reject its statute of limitations defense and deciding Bartel's title insurance action was timely. Bartel counters that the interim judgment properly rejected Chicago Title's statute of limitations defense and applied equitable tolling consistent with the California Supreme Court's decision in *Lambert, supra,* 53 Cal.3d 1072, and with the primary right doctrine. Bartel

20

asserts in the alternative that, even assuming equitable tolling paused upon the dismissals of Composti I and Composti II, it resumed when Bartel timely reasserted tender of defense based on Composti III.

### 1. Legal Principles and Standard of Review

The affirmative defense of statute of limitations "exists to promote the diligent assertion of claims, ensure defendants the opportunity to collect evidence while still fresh, and provide repose and protection from dilatory suits once excess time has passed." (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191 (*Aryeh*).) "A plaintiff must bring a claim within the limitations period after accrual of the cause of action." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806; see Code Civ. Proc., § 312.) A cause of action typically "accrues at 'the time when the cause of action is complete with all of its elements.' " (*Fox*, at p. 806.) "Actions on title insurance policies are subject to a two-year statute of limitation. (Code Civ. Proc., § 339, subd. (1).)" (*Lee v. Fidelity National Title Ins. Co.* (2010) 188 Cal.App.4th 583, 599.) Accrual of a cause of action upon a contract or policy of title insurance does not occur "until the discovery of the loss or damage suffered by the aggrieved party thereunder." (Code Civ. Proc., § 339, subd. (1).)

Certain equitable exceptions "may alter the rules governing either the initial accrual of a claim, the subsequent running of the limitations period, or both." (*Aryeh, supra*, 55 Cal.4th at p. 1192.) These exceptions exist "[t]o align the actual application of the limitations defense more closely with the policy goals animating it." (*Ibid*.) Equitable tolling, applied by the trial court here, "may suspend or extend the statute of limitations when a plaintiff has reasonably and in good faith chosen to pursue one among several remedies and the statute of limitations' notice function has been served." (*Ibid*.)

21

In *Lambert,* our Supreme Court examined whether a cause of action under a title insurance policy alleging a failure to defend accrues when the insurer refuses to defend or when the underlying action is terminated by final judgment. (*Lambert, supra,* 53 Cal.3d at p. 1074.) After considering the statutory language and policies underlying the duty to defend, the court concluded that "[a]lthough the statutory period commences upon the refusal to defend, it is equitably tolled until the underlying action is terminated by final judgment." (*Id.* at p. 1077.)

While resolution of the statute of limitations is normally a question for the trier of fact, the application of the statute of limitations on undisputed facts is a purely legal question that we review de novo. (*Aryeh, supra,* 55 Cal.4th at p. 1191; see *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112.)

2. <u>Analysis</u>

Chicago Title contends that, under *Lambert,* the respective dismissals of Composti I, on June 23, 2011, and Composti II, on October 16, 2012, ended any tolling of the two-year statute of limitations period for filing a complaint alleging breach of the duty to defend those actions. Since Bartel did not file the instant action until October 27, 2016 (more than two years after the dismissal of Composti II), Chicago Title asserts that Bartel's claim for breach of the duty to defend in Composti I and Composti II is time barred.

Chicago Title argues that the trial court misinterpreted *Lambert* to mean that only a judgment, and no other form of termination in the underlying action, can end the tolling of the limitations period. Chicago Title maintains that the court's construction of the law ignored the legal consequences of the prior dismissals and erroneously treated the underlying Composti actions as though they constituted a single, continuous claim.

22

Bartel counters that Composti's dismissals without prejudice of his earlier lawsuits did not amount to a final judgment or bar the filing of another lawsuit based on the same claim or primary right. Bartel further maintains that, even assuming each dismissal without prejudice halted or paused equitable tolling, the tolling resumed upon Composti's reassertion of the easement claim by way of his May 4, 2014 cross-complaint, thereby extending the statute of limitations period and rendering the filing of Bartel's complaint timely. Chicago Title does not address this argument in its respondent's brief.

We agree with the parties that *Lambert* guides our resolution of the application of the statute of limitations here. In that decision, our Supreme Court explained, "The duty to defend in a title insurance case is governed by the same principles which govern the duty to defend under general liability policies. [Citations.] The duty commences upon tender of the defense, and continues until the underlying lawsuit is concluded." (*Lambert, supra*, 53 Cal.3d at p. 1077.) In rejecting a prior appellate decision that had held that the statute of limitations begins to run upon the rejection of tender, the court stated that such a rule "would allow expiration of the statute of limitations on a lawsuit to vindicate the duty to defend even before the duty itself expires. This grim result is untenable. The insured must be allowed the option of waiting until the duty to defend has expired before filing suit to vindicate that duty." (*Ibid*.)

The Supreme Court held that the statute of limitations begins to run "upon accrual, which in this case occurs upon the refusal to defend." (*Lambert, supra*, 53 Cal.3d at p. 1078.) It further decided that the statute of limitation should be equitably tolled between accrual and a final judgment. It reasoned, "the duty to defend is a continuing duty. It is equitable and

consistent with the legislative intent to toll the limitations period in which this duty continues from the date of accrual of a cause of action to final judgment." (*Id*. at p. 1079.)

The Supreme Court emphasized that its decision was grounded in equitable principles: "It is harsh to require an insured—often a private homeowner—to defend the underlying action, at the homeowner's own expense, and *simultaneously* to prosecute—again at the homeowner's own expense—a separate action against the title company for failure to defend. '[T]he unexpected burden of defending an action may itself make it impractical to immediately bear the additional cost and hardship of prosecuting a collateral action against an insurer.' " (*Lambert*, *supra*, 53 Cal.3d at p. 1078.) The court reasoned that this rule would not prejudice the insurer. "By tendering defense of a third party action to an insurer, the insured will have put the insurer on notice that it may be required under the policy to defend the action. Thus, the insured [*sic*] will be aware that it must take the steps necessary to prepare and preserve a defense to an action by its insured." (*Id*. at p. 1079.) Moreover, an insured has the option of bringing suit against the insurer prior to the entry of final judgment in the underlying litigation. Nothing "prohibits the insured from commencing an action once the insurer has refused a tender of defense. We merely conclude that the insured is not required to do so." (*Id*. at p. 1080.)

Applying the principles articulated in *Lambert* to the facts here, we decide that Bartel's title insurance action against Chicago Title was timely. Composti filed Composti I, which asserted a right-of-way easement benefiting Composti's parcel over Bartel's parcel, on May 25, 2010. Bartel tendered defense to Chicago Title in Composti I on March 18, 2011, triggering Chicago

Title's duty to defend. (See *Buss v. Superior Court* (1997) 16 Cal.4th 35, 46 (*Buss*) [stating the duty to defend "arises as soon as tender is made"].)

Upon receipt of tender in Composti I, Chicago Title investigated whether the claims against Bartel were covered by his policy. We describe the investigation conducted by Chicago Title's claims counsel in more detail in our discussion of Bartel's bad faith claim, *post* (pt. II.D.1.).

On July 27, 2011, Chicago Title declined (in connection with Composti II) to accept tender.[9] Bartel's claim against Chicago Title therefore accrued on July 27, 2011. Under the principles articulated in *Lambert*, the claim was equitably tolled until October 16, 2012, the date on which Composti II was dismissed without prejudice.[10] Beginning on that date, Bartel had two years—that is, until October 16, 2014—to bring a claim against Chicago Title for violation of its duty to defend in Composti I and Composti II.

On May 14, 2014 (approximately five months prior to the running of the statute of limitations), Composti filed his cross-complaint (Composti III)

_____

[9] In their arguments on the statute of limitations, the parties do not distinguish between Composti I and Composti II, which were filed sequentially (with only about two weeks between the lawsuits) and asserted identical claims. Chicago Title's initial rejection of tender, dated July 27, 2011, similarly appears to have combined its consideration of the lawsuits, referring without distinction to the tender of defense (submitted in connection with the filing of Composti I) and to the complaint served in Composti II, and utilizing the same claim number (403738) throughout. We similarly analyze Composti I and Composti II together in assessing the application of the statute of limitations.

[10] We reject Bartel's contention that equitable tolling continues after a dismissal without prejudice. The duty to defend is bound to the pendency of the underlying action and terminates upon its conclusion. Once dismissed, there is no pending action on that claim, regardless of whether a future action arises. (See *Abatti v. Imperial Irrigation Dist.* (2012) 205 Cal.App.4th 650, 666 ["[C]laims that have been dismissed, whether with or without prejudice, are not 'pending.' "].)

against Bartel. Composti III reasserted the theory of an easement that Composti had made in Composti I and Composti II and as to which Chicago Title had previously declined to accept tender. On September 5, 2014 (over one month before the running of the statute of limitations from the dismissal of Composti II), Bartel again tendered defense to Chicago Title.

Under the Supreme Court's analysis in *Lambert*, this tender of defense triggered Chicago Title's duty to defend. (See *Lambert*, *supra*, 53 Cal.3d at p. 1077 ["The duty commences upon tender of the defense, and continues until the underlying lawsuit is concluded."].) We decide that, on these facts, Bartel's tender of the defense equitably tolled the statute of limitations for bringing suit against Chicago Title as of the date of the tender.

While normally Bartel's cause of action against his insurer would not accrue until the rejection of tender by Chicago Title, on the facts here equitable principles support its application as of the date of Bartel's tender of suit in Composti III. Chicago Title treated Composti III essentially as an extension of Composti I and Composti II. It reopened the tender of the cross-complaint under the same claim number (403738) assigned to the prior tender of claims under Composti I and Composti II. Chicago Title's rejection of the Composti III tender cited the same reasons previously given based on the policy exceptions it had used in rejecting tender in the earlier litigation.

Chicago Title had already clearly and repeatedly indicated that it would not defend Bartel against Composti's assertion of an easement when Bartel tendered suit in Composti III. Chicago Title's declination of tender on October 28, 2014, and again on January 27, 2015—stating the same reasons given for the rejection in Composti II—confirmed the accrual of Bartel's claim against Chicago Title for its failure to defend him in Composti I, II, and III. The insurer was fully on notice of Bartel's belief that it had a duty to defend

26

him in the Composti litigation and had already conducted its own investigation of the facts underlying the litigation. Applying the principles of equitable tolling articulated in *Lambert*, the limitation period for Bartel's action against Chicago Title was tolled between September 5, 2014 (the date of tender by Bartel to Chicago Title of Composti III) and January 23, 2017, the termination of Composti III.

Bartel brought his suit against Chicago Title on October 17, 2016, well before the expiration of the tolling period. His suit (based on Chicago Title's failure to defend him in Composti I, Composti II, and Composti III) was therefore not barred by the statute of limitations.[11]

*B. Duty to Defend*

Chicago Title challenges the trial court's ruling on the duty to defend on two grounds. First, based on language in Bartel's policy, Chicago Title contends the trial court erred as a matter of law in concluding that the insurer had a continuing duty to defend Bartel in the underlying actions. It cites language in the policy that provides for the duty to defend "litigation," not a "claim," and it argues the voluntary dismissals of Composti I and Composti II terminated any duty to defend those actions. Second, Chicago Title contends the trial court erred in basing the duty to defend Composti I and Composti II " 'as of the date of Bartel's first tender' " in March 2011 on the determination in Composti III and the attachment of the Boyd-Sluyter deed to the complaint in the first two actions.

Bartel responds that under well-settled California law, the information known to Chicago Title upon tender of Composti I and Composti II

---

[11] In light of this conclusion, we need not address Bartel's alternative arguments that Chicago Title is equitably estopped from relying on the statute of limitations and that the statute of limitations defense is moot.

overwhelmingly supports the trial court's interim judgment ruling on the duty to defend. Bartel further argues that because the court did not award damages for the " 'donut hole' " time frame or for any periods in which litigation was not pending, Chicago Title is not aggrieved by the trial court's ruling on the insurer's "continuing" duty to defend and lacks standing to challenge this issue on appeal.

1. Additional Background

Bartel's title insurance policy, obtained from Chicago Title in 1998, states in relevant part as to coverage: "Subject to the exclusions from coverage, the exceptions from coverage contained in schedule B and the conditions and stipulations . . . [Chicago Title] insures, as of [the policy date] against loss or damage . . . sustained or incurred by the insured by reason of: [¶] 1. Title to the estate or interest described in schedule A being vested other than as stated therein; [¶] 2. Any defect in or lien or encumbrance on the title." (Some capitalization omitted.)

Regarding the defense and prosecution of actions, the policy states: "Upon written request by an insured and subject to the options contained in . . . these [c]onditions and [s]tipulations, [Chicago Title] at its own cost and without unreasonable delay, shall provide for the defense of such insured in litigation in which any third party asserts a claim adverse to the title or interest as insured."

In the event of any litigation, the policy provides that Chicago Title "shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title . . . as [i]nsured."

As to the exceptions from coverage, the policy states: "This policy does not insure against loss or damage . . . which arise by reason of" certain

28

matters specified in parts I and II of schedule B, including "3.  Easements, liens or encumbrances, or claims thereof, which are not shown by the public records"; and "5.  A road maintenance agreement, including the terms, covenants, provisions and assessments, as contained in the agreement entered into [b]y and between:  Mary Swafford, et al[.]  [¶] Recorded: September 2, 1970 in Book 2039, Page 369, Official Records of Santa Cruz County  [¶]  Instrument No. 23843" (followed by a list of recorded amendments to the road maintenance agreement).

As described in our summary of the underlying litigation (see *ante*, part I.A.), identical complaints in the Composti I and Composti II actions asserted quiet title to an easement over Bartel's parcel by prescription and by operation of the 1970 road maintenance agreement.  Specifically, paragraph Nos. 10 and 11 of both complaints asserted a right-of-way easement by "map" and "[a]greement," referring to the "Lower Road" allegedly identified on the recorded map attached as exhibit B to the 1970 agreement.  The complaints alleged that the 1970 agreement and recorded map "imposed binding covenants on the use of the properties governed by the contract."  Both complaints further asserted, in the heading to paragraph 11, that "Neither Parcel has Deeded Easement."  (Underscoring omitted.)

Composti I and Composti II also alleged, in paragraph 12, as an alternative to the "express easement established by" the 1970 agreement, right-of-way easements by prescription based on "long term adverse use." The complaints (with the exception of the Composti II amended complaint) expressly disclaimed easement established by deed, stating in paragraph No. 11 of each that "neither parcel has [a] deeded easement."  (Capitalization & underscoring omitted.)  The complaints in Composti I and Composti II also

29

included a copy of the Boyd-Sluyter deed as exhibit G, but made no specific allegations pertaining to the deed.

By contrast, in Composti III, as described *ante* (pt. I.A.3.), Composti alleged an express deeded easement in the "grant deeds to the described parcels from and after 1970" and later established, at trial and as affirmed on appeal, the 1971 Boyd-Sluyter deed as the basis for an express deeded easement over Pax Place Court through parcel No. 6. (*Bartel*, *supra*, H044464.)

### 2. Legal Principles and Standard of Review

"The duty to defend is guided by several well-established principles." (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 287 (*Hartford*).) "An insurer owes a broad duty to defend against claims that create a potential for indemnity under the insurance policy. (*Gray*[, *supra*,] 65 Cal.2d 263, 277–278.) An insurer must defend against a suit even ' "where the evidence suggests, but does not conclusively establish, that the loss is not covered." ' (*Montrose*[, *supra*,] 6 Cal.4th 287, 299 [].)" (*Ibid*.) "Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor." (*Horace Mann, supra*, 4 Cal.4th at p. 1081.) "[T]he insurer has a duty to defend the insured as to the claims that are at least potentially covered." (*Buss, supra*, 16 Cal.4th at p. 49.) "The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." (*Horace Mann*, at p. 1078; accord *Hartford*, at p. 287.) "This includes all facts, both disputed and undisputed, that the insurer knows or ' "becomes aware of" ' from any source

[citation] 'if not "at the inception of the third party lawsuit," then "at the time of tender." ' " (*Hartford*, at p. 287.)

The California Supreme Court has recognized that its opinion in "*Gray* made clear that facts known to the insurer and extrinsic to the third party complaint can generate a duty to defend, even though the face of the complaint does not reflect a potential for liability under the policy. [Citation.] This is so because current pleading rules liberally allow amendment; the third party plaintiff cannot be the arbiter of coverage." (*Montrose, supra*, 6 Cal.4th at p. 296.) Stated differently, " '[T]hat the precise causes of action pled by the third party complaint may fall outside policy coverage does not excuse the duty to defend where, under the facts alleged, reasonably inferable, or otherwise known, the complaint could fairly be amended to state a covered liability.' [Citation.] Thus, '[i]f any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage.' " (*Hartford, supra*, 59 Cal.4th at p. 287.)

To determine whether the insurer owed the insured a duty to defend, the reviewing court examines the insurance policy at issue. (*Hameid v. National Fire Ins. of Hartford* (2003) 31 Cal.4th 16, 21 (*Hameid*).) "Insurance policy interpretation is a question of law." (*Ibid.*; accord, *Hartford, supra*, 59 Cal.4th at p. 288.) Appellate courts "apply an independent standard of review to decisions interpreting, constructing, and applying insurance policies to determine the scope of actual or potential coverage." (*Food Pro Internat., Inc. v. Farmers Ins. Exchange* (2008) 169 Cal.App.4th 976, 984–985 (*Food Pro*); see also *Atlantic Mutual Ins. Co. v. J. Lamb, Inc.* (2002) 100 Cal.App.4th 1017, 1031.)

3. <u>Analysis</u>

Bartel's title insurance policy provides for the defense of the insured "in litigation in which any third party asserts a claim adverse to the title or interest as [i]nsured." Applying our independent construction of the policy language (*Hameid*, *supra*, 31 Cal.4th at p. 21; *Food Pro*, *supra*, 169 Cal.App.4th at pp. 984–985), Composti's claim of easement against the property—once asserted "in litigation" within the meaning of the policy language—would adversely affect "[t]itle to the estate or interest described in" the policy.

Indeed, Chicago Title does not dispute that the easement claim asserted in the Composti I and Composti II complaints qualified as an adverse claim asserted in litigation and therefore fell within the scope of policy coverage *unless* it came within one of the stated exclusions. The relevant policy exclusions in this case are the exceptions from coverage for an easement that is either "not shown by the public records" or "contained in the" 1970 agreement.

Chicago Title contends that there was no basis for Chicago Title to ascertain coverage because (1) the complaints in Composti I and Composti II asserted a claim for easement on grounds expressly excepted or excluded from the policy coverage and (2) each complaint expressly denied the existence of a deeded easement. Chicago Title argues that neither the complaints "nor anything else" gave it "even a hint that Composti might later disavow those allegations and assert a claim for a deeded easement potentially within coverage of the title insurance policy."

Chicago Title emphasizes the trial court's and parties' recognition in Composti III that the attachment of the Boyd-Sluyter deed to the earlier complaints served the function of identifying the location of the easements as

alleged and that only " 'after reviewing all of the deeds that were created by Opal Boyd, starting with the Boyd-to-Sluyter Deed' . . . and by '[c]onstruing the described deeds from Opal Boyd as a whole' " did the trial court in Composti III reach a determination that there existed a deeded easement over Bartel's parcel. Chicago Title also points to the testimony of Bartel's expert at the Composti III trial as evidence that the Boyd-Sluyter deed could not be read, without more, as creating the easement ultimately awarded by the Composti III judgment.[12] Chicago Title argues that under these circumstances, nothing in the record indicated that Composti might later "reverse course" from its prior verified complaints to claim a deeded easement, which Composti III ultimately awarded.

By asserting that the Composti I and Composti II complaints gave no hint of the possibility of a potentially covered claim, Chicago Title ignores the evidence of the Boyd-Sluyter grant deed attached to both complaints and the ambiguity created both by the complaint allegations and attached exhibits, including the recorded map and grant deeds. Further, Chicago Title's argument is contrary to well-established principles of insurance law. When making a coverage decision, the insurer bears the burden of ascertaining whether the facts alleged or inferable in the complaint, together with the extrinsic evidence known or discovered by the insurer, could give rise to a covered complaint. (*Montrose*, *supra*, 6 Cal.4th at p. 296.) Although it is true that the Composti I and Composti II complaints sought an easement established by the 1970 agreement, and/or by prescription, and that the

---

[12] Bartel's expert witness Charles Hansen, who was admitted to testify on topics including the claims investigation and analysis conducted by Chicago Title, testified that he did not read the Boyd-Sluyter deed "as reflecting the necessary intent to create an easement over the Bartel property."

policy expressly excluded both such theories of easement, this does not end the court's inquiry, nor should it have ended that of Chicago Title. The mere *possibility* that facts extrinsic to the complaint might reveal a claim that could be covered by the policy is sufficient to trigger the duty to defend. (*Horace Mann*, *supra*, 4 Cal.4th at p. 1078; accord *Hartford*, *supra*, 59 Cal.4th at p. 287.)

We recognize that resolution of the existence of an easement conveyed by the Boyd-Sluyter deed was obscured by the general confusion surrounding the location of unnamed, private roads and the effect of the 1970 agreement, various deeds, legal descriptions, and land surveys. Neither pleading in Composti I or Composti II is a model of clarity. While both complaints alleged a right to quiet title to easement against multiple neighboring property owners, including Bartel, the allegations (including the heading to paragraph 11, denying any deeded easement) are imprecise and do not clearly denote to which "[p]arcel" the denial of deeded easement refers, given that multiple parcels were at issue in the complaints. The significance of the denial is further clouded by the inclusion of the Boyd-Sluyter deed as attachment G, which (as stated in the complaints) "describe[s] and/or depict[s]" the "Lower Road" (later understood to be Pax Place). The issue was not resolved until a lengthy court trial and the decision on appeal in *Bartel v. Composti*, *supra*, H044464.

Nevertheless, the difficulty of assessing the legal effect of the deed or of resolving the facts underlying its description of a 40-foot right-of-way (and whether it referred to the same right-of-way established by the 1970 agreement) do not negate the insurer's duty to evaluate the extrinsic evidence for the potential of a covered claim. (See *Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 520 (*Howard*) [" 'If

coverage depends on an unresolved dispute over a factual question, the very existence of that dispute would establish a possibility of coverage and thus a duty to defend.' "].)

The complexity of the underlying facts does not shield the insurer from the risk of erroneously denying the tender of defense. With regard to the denials of a deeded easement, the ambiguity in the pleading of Composti I and Composti II and resulting confusion as to whether the claimed easement was subject to the exclusion from coverage based on the 1970 agreement raises considerable doubt as to the legal effect of the denials. As a consequence, Composti's disclaimer does not eliminate the possibility of a covered claim.

While the denials in Composti I and Composti II could arguably be read to foreclose the possibility of a potentially covered claim (since the allegations of an unrecorded easement or easement under the 1970 agreement were already excepted from coverage), the duty to defend is "fixed by the facts which the insurer learns from the complaint, the insured, or other sources" (*Gray*, *supra*, 65 Cal.2d at p. 276) and not by the causes of action or theories pled by the third party complaint. Thus, we decide the arguably ambiguous denial of a theory of liability in the complaints—especially where potentially contradicted by facts ascertainable therein—is not dispositive of the duty to defend. Moreover, "[a]ny doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor." (*Montrose*, *supra*, 6 Cal.4th at pp. 299–300; accord, *Horace Mann*, *supra*, 4 Cal.4th at p. 1081; see *id*. at p. 1084 [noting "we must resolve the uncertainty in the insured's favor," where the factual record is unclear concerning key facts that might resolve the coverage question].)

Chicago Title's arguments to the contrary conflate its defenses to Bartel's later claims of bad faith with its "broad duty to defend against claims that create a *potential* for indemnity under the insurance policy" (*Hartford*, *supra*, 59 Cal.4th at p. 287), even " ' "where the evidence suggests, but does not conclusively establish, that the loss is not covered." ' " (*Ibid*.) As our Supreme Court has repeatedly emphasized, "the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded." (*Horace Mann*, *supra*, 4 Cal.4th at p. 1081; *Buss*, *supra*, 16 Cal.4th at p. 46.)

There is no dispute as to the factual underpinning of the duty to defend determination in this case. Chicago Title was aware of the Boyd-Sluyter deed as early as Bartel's first tender of Composti I and assigned claims counsel to investigate the claim. Claims counsel had access to the relevant deed and other documents necessary to evaluate whether any of the referenced documents created a potential for coverage by referencing a right-of-way not subject to the policy exceptions. Nevertheless, Chicago Title repeatedly denied Bartel's renewed requests for tender. This is not a scenario in which the nature of Composti's claim (to establish a legal right-of-way over the property) was outside the scope of coverage and "[n]o reasonable construction of the claim could potentially bring it within the coverage of the policy." (*Montrose*, *supra*, 6 Cal.4th at p. 302.)

Furthermore, the record establishes (and Chicago Title does not dispute) that as of Bartel's initial tender of Composti I, Chicago Title was aware of facts in the grant deed that, however unlikely, could give rise to the possibility of a covered claim. As noted by Bartel's expert (whose testimony Chicago Title cites in support of its position that the Boyd-Sluyter deed could not be read to support a deeded easement claim), while he "did not read the

Boyd to Sluyter deed . . . as reflecting the necessary intent to create an easement over the Bartel property, . . . . [t]hat's very different from saying that there wasn't a possibility that a [c]ourt would determine that because, as you know, when [c]ourts construe deeds, they are basically divining intent of people who are long gone, and it's very difficult to rule things out when a [c]ourt is going to be trying to determine what a grantor and grantee intended."

While it may be true that Chicago Title was not required to speculate about unpleaded theories of easement, it *was* obligated to investigate whether the extrinsic facts known to it at tender raised a possibility of liability within the scope of the policy's coverage. "[T]he carrier must defend a suit which potentially seeks damages within the coverage of the policy" (*Gray*, *supra*, 65 Cal.2d at p. 275) and "cannot construct a formal fortress of the third party's pleadings and retreat behind its walls. The pleadings are malleable, changeable and amendable." (*Id*. at p. 276.) Chicago Title's citation to *Gunderson v. Fire Ins. Exchange* (1995) 37 Cal.App.4th 1106 (*Gunderson*) does not demonstrate otherwise, as the facts known to the insurer at the time of tender in the underlying quiet title case fell outside of the policy provisions for coverage for " 'property damage' " or " 'bodily injury' " (*id*. at p. 1115), and most of the alleged extrinsic evidence of a potential property damage claim arose after the underlying complaint was filed and tendered for defense. (*Id*. at p. 1117.)

Nor are we persuaded by the additional ground advanced by Chicago Title to challenge the trial court's duty to defend ruling. Chicago Title asserts that the court erroneously relied on the January 23, 2017 judgment in Composti III as the basis for determining Chicago Title's duty to defend in the earlier Composti actions. It maintains that in so doing, the trial court

misapplied case authority pertaining to the scope of an insurer's duty to indemnify versus its duty to defend.

We disagree. The trial court correctly recognized that an insurer in the subsequent insurance coverage action is bound by the judgment in the underlying action on the issue litigated. In this case, that issue was the existence of a deeded easement over parcel No. 6 based on the Boyd-Sluyter deed. The judgment in Composti III showed that it would have been possible to assert a covered claim in the earlier actions by amending the complaint to allege a deeded easement based on the attached exhibit G. This finding by the court is consistent with case authority providing the "general rule that a liability ' "insurer who has had an opportunity to defend [the underlying action brought against its insured] is bound by the judgment against its insured as to all issues which were litigated in the action," ' " provided the insurer had proper notice of the pendency of that action. (*Pruyn v. Agricultural Ins. Co.* (1995) 36 Cal.App.4th 500, 515 (*Pruyn*); see *Hogan v. Midland National Ins. Co.* (1970) 3 Cal.3d 553, 564.)

The trial court's ruling on Chicago Title's duty to defend, based on the presence of the Boyd-Sluyter deed in the materials accompanying Bartel's first tender of defense, is consistent with this case authority. It confirms only that an insurer's duty to defend is based on the information known to the insurer at the time of the third party lawsuit, as distinguished from issues not litigated in that action (such as the construction of the policy language). (See, e.g., *Schaefer/Karpf Productions v. CNA Ins. Co.* (1998) 64 Cal.App.4th 1306, 1312.) Because the court's determination of Chicago Title's duty to defend was properly based on the matter litigated in Composti III and on the undisputed fact that Chicago Title was aware of the grant deed attached to the Composti I and Composti II complaints, Chicago Title's challenge on that

ground is misplaced. We conclude the trial court did not err in finding a duty to defend Composti I and Composti II " 'as of the date of Bartel's first tender' " in March 2011.

Turning to whether the trial court erred in concluding that the insurer had a "continuing" duty to defend Bartel in the underlying actions, we disagree with Chicago Title's characterization of the trial court's ruling. Chicago Title asserts that the court ignored the policy language providing, in Chicago Title's words, for a duty to defend "litigation" by erroneously finding the insurer had a duty to defend " 'Composti's easement claim' commencing with the tender of Compost I and 'continuing' through Composti III, despite the dismissals of Composti I and Composti II."

We do not view the court's finding regarding "the continuous existence of the duty to defend from March 18, 2011 forward" as inconsistent with the policy language distinguishing the insurer's duty to defend "litigation" from its options to pay or otherwise settle "claims." Even as the trial court found the duty to defend to be a "continuing obligation" beginning with the tender of Composti I, it did not hold Chicago Title continuously liable without heed to the period in which there was no litigation pending. Rather, the court found Chicago Title liable for costs, attorney fees, and interest incurred by Bartel from the tender of Composti I through the dismissal of Composti II,[13] and from the tender of Composti III through judgment. Thus, the court did not presume or assign liability for the substantial " 'donut hole' " period

---

[13] Although the trial court did not specify no damages for the approximately two-week break in litigation between Composti I and Composti II, Chicago Title does not identify the inclusion of the de minimis period as error or assert that damages were wrongly quantified as a result.

between litigation in Composti II and Composti III but instead reserved that issue for trial in the phase II trial.

Nor do we agree that the trial court's language is contrary to established case law. Chicago Title cites *Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857 for the proposition that an insurer has no duty to defend a " 'claim' " where the policy provides only for the defense of a " 'suit,' " though the insurer retains discretion to settle a " 'claim.' " In *Foster-Gardner*, the California Supreme Court confirmed the distinction between insurance policy terminology pertaining to a " 'suit' " (referring to "actual court proceedings initiated by the filing of a complaint") (*id*. at p. 878) and a " ' "claim" ' " (referring to "any number of things" that " 'may ultimately ripen into a suit' ") (*id*. at p. 879). The court held that due to these differences, a precomplaint notice to an insured party regarding its responsibility for environmental pollution remediation does not trigger the insurer's duty to defend a " 'suit.' " (*Id*. at p. 880.)

*Foster-Gardner* does not render erroneous the trial court's reference to "continuing duty." Chicago Title rejected tender in response to filed litigation, i.e., a bonafide lawsuit, not a prelitigation letter advising of a potential "claim." Nor did the trial court err in referring to the "continuing" nature of the insurer's duty to defend, at least when in reference to a pending action, as discussed in our analysis of the statute of limitations defense, *ante* (pt. II.A.2). (See *Montrose, supra*, 6 Cal.4th at p. 295.) Moreover, the court's reference in the interim judgment to a continuing duty to defend from the tender of Composti I through the judgment in Composti III does not reflect the scope of liability ultimately assigned by the judgment, which awarded Bartel damages solely for the periods of litigation against an asserted claim.

40

We reject Chicago Title's attack on the judgment based on the trial court's resolution of the scope of the insurer's duty to defend Bartel in litigation.

*C. Donut Hole Damages*

Bartel contends that the trial court should have awarded damages on the breach of contract claim for the " 'donut hole' " period from October 16, 2012 (the dismissal of Composti II) to September 5, 2014 (the date of tender by Bartel to Chicago Title in Composti III). He argues the damages for this period are properly recoverable under either the bad faith claim (discussed *post*, pt. II.D.) or the breach of contract claim. He asserts that in ruling that his expenses for that period were not recoverable under the breach of contract theory, the court contravened case authority assigning risk of liability to the insurer who wrongfully refuses to provide coverage to its insured and undercut the interim judgment ruling that the duty to defend was a continuing obligation. Chicago Title responds that the court correctly refused to award damages for that period under the plain language of the policy, which provides for a defense to " 'litigation.' "

1. Additional Background

The phase I judgment deferred the question of liability for the " 'donut hole' " period for resolution at the subsequent bench trial. The trial court noted that Chicago Title could assert at that time that despite "the continuous existence of the duty to defend from March 18, 2011 forward, it [was] not liable for expenses incurred by Bartel from October 16, 2012 to September 5, 2014 due to a lack of notice or re-tender." It noted the finder of fact would "need to address whether, under the facts present, the duty to defend and/or covenant of good faith and fair dealing required an extra level of attention and service by Chicago Title, including active participation in

41

resolving Composti's recurring easement claim regardless of notice, re-tender, or whether affirmative claims by Composti were currently pending."

In the judgment following the second phase of trial, the trial court found that pursuant to section 4 ("Defense and Prosecution of Actions") (some capitalization & boldface omitted) of the policy, the insured had to tender a written request to the insurer for " 'the defense of the insured in litigation.' " Because Bartel did not tender defense and there was no litigation after the dismissal of the Composti II complaint as of October 16, 2012, the court ruled that expenses for the " 'donut hole' " period were not reimbursable.

Several sections of the policy are relevant to whether the trial court erred in this conclusion. Section 4 ("Defense and Prosecution of Actions") (some capitalization & boldface omitted), states: "(a) Upon written request by an insured and subject to the options contained in [s]ection 6 of these [c]onditions and [s]tipulations, [Chicago Title], at its own cost and without unreasonable delay, shall provide for the defense of such insured in litigation in which any third party asserts a claim adverse to the title or interest as insured."

Section 6 ("Options to Pay or Otherwise Settle Claims") (some capitalization & boldface omitted), states: "In case of a claim under this policy, [Chicago Title] shall have the following additional options: [¶] . . . [¶] (b)(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by [Chicago Title] up to the time of payment and which [Chicago Title] is obligated to pay."

Section 7 ("Determination and Extent of Liability") (some capitalization & boldface omitted), provides: "This policy is a contract of indemnity against

42

actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.  [¶] . . . [¶]  (d) [Chicago Title] will pay only those costs, attorneys' fees and expenses incurred in accordance with [s]ection 4 of these [c]onditions and [s]tipulations."

### 2.  Standard of Review

The parties do not address the applicable standard of review.  Because the historical facts do not appear to be in dispute and the court's inquiry was predominantly legal, we review its decision de novo.  (See *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 801 (*Ghirardo*).)

### 3.  Analysis

The factual basis for this damages claim arises from Bartel's continuing efforts to pursue a resolution of Composti's escalating use of Pax Place Court after the dismissal without prejudice of Composti II.  Bartel did not notify Chicago Title of a claim against the property until the filing of the Composti III cross-complaint.  According to the trial court, though "difficult to decipher" from the spreadsheets, Bartel's claimed " 'donut hole' " damages appeared to total $59,452.55.

Bartel contends that Chicago Title's abandonment during that period did not absolve it of liability under the policy, because the title dispute remained uncured and Composti's use of the road had escalated.  Citing *Pruyn*, *supra*, 36 Cal.App.4th at pages 514–515, he maintains that this abandonment left him free to attempt a reasonable resolution of the easement problem and later seek reimbursement from Chicago Title.

Bartel asserts that he was not required to renew tender after Chicago Title denied coverage, because an insurer who wrongfully refuses coverage

43

gives up the right to control the resolution of the problem and must accept the insured's reasonable course of action.  In support, Bartel cites cases including *Samson v. Transamerica Ins. Co.* (1981) 30 Cal.3d 220, 238 (*Samson*), *Stalberg v. Western Title Ins. Co.* (1991) 230 Cal.App.3d 1223, 1232–1233 (*Stalberg*), and *Moe v. Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 289, 302 (*Moe*).  He contends that pending litigation was not a prerequisite to coverage under the policy, which insured against "any 'loss or damage' sustained from 'any *defect in* or lien or encumbrance on *the title*' " and further provided, in section 6 ("Conditions and Stipulations"), that Chicago Title "must 'pay or otherwise settle . . . any claim insured against under this policy.' "

Bartel's reading ignores unambiguous terms of the policy.  Bartel cites to the first page of the policy that refers to the insurer providing coverage "against loss or damage . . . sustained or incurred by the insured by reason of: [¶]  . . .  [¶]  2. Any defect in or lien or encumbrance on the title."  However, the opening section of the policy provides that its coverage is "subject to the exclusions from coverage, [and] the exceptions from coverage contained in schedule B and the conditions and stipulations."  (Capitalization omitted.) The policy specifies in section 7 that the extent of liability for costs, attorney fees, and expenses is limited to those "incurred in accordance with [s]ection 4," which provides for a duty to defend actions "[u]pon written request by an insured" and "for the defense of such insured *in litigation* in which any third party asserts a claim adverse to the title" (italics added).  With this language, the insurance contract defines the duty to defend solely in relation to "litigation" in which an adverse claim is pending.

Bartel also points to language in section 6 and asserts that under that section, Chicago Title must pay or otherwise settle any claim insured under

44

the policy, including title defects such as easements that were not excepted from coverage, regardless of whether there is any pending litigation regarding those defects.  This argument fails to recognize that section 6 pertains to the insurer's "*options* to pay or otherwise settle claims" (italics added, capitalization & boldface omitted) and does not define the scope of its coverage or liability, which is set forth in sections 4 and 7 of the conditions and stipulations.

The cases cited by Bartel do not assist him because they rely on denial of tender where the insurer has received notice of a pending action.  These cases reinforce the proposition that an insurer who wrongfully refuses to provide its insured with a defense will be bound by the outcome based on the insured's good faith efforts to resolve the matter.  (See *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 660 ["An insurer who denies coverage does so at its own risk, and, although its position may not have been entirely groundless, if the denial is found to be wrongful it is liable for the full amount which will compensate the insured for all the detriment caused by the insurer's breach of the express and implied obligations of the contract."].)  This was the case in *Pruyn*, which involved an appeal from the dismissal of the insured's complaint against the insurer to enforce a stipulated judgment entered in her favor after she settled a claim for damages in the underlying action.  (*Pruyn, supra*, 36 Cal.App.4th at p. 509.)  The court explained, "It is the general rule that a liability ' "insurer who has had an opportunity to defend [the underlying action brought against its insured] is bound by the judgment against its insured as to all issues which were litigated in the action. . . ." [Citation.]  The operation of this rule . . . "*depends primarily upon notice to the insurer of the pendency of the action.*" ' " (*Id.* at p. 515, italics added.)  Bartel did not inform Chicago Title of his efforts to oppose

45

Composti's use of the road across the property after the dismissal of Composti II until he tendered defense in Composti III.  Thus, *Pruyn* is inapplicable.

Bartel maintains that he was not required to renew tender after Chicago Title wrongfully refused to defend him in the first two underlying actions.  The cases cited by Bartel for this point are factually distinguishable in that they involve a single underlying action, in which the insurer denied coverage, and the insured was "thereby relieved of his obligation to notify the insurance company of the progress of the action against him." (*Samson*, *supra*, 30 Cal.3d at p. 238.)  The cases cited by Bartel that absolve an insured of the need to renotify the insurer after the wrongful denial of a tender for defense do not address circumstances in which the alleged liability for the insured's attorney fees and expenses extends to preparations for a separate action from that in which the insurer had notice.  (See, e.g., *Samson*, at pp. 238–239; *Stalberg*, *supra*, 230 Cal.App.3d at p. 1233 [holding that when insurer refused plaintiffs' tender of their appeal in the underlying action, it "gave up the right to control the litigation and could not insist that plaintiffs use" a specific law firm to cover the attorney's fees on appeal]; *Moe*, *supra*, 21 Cal.App.3d at p. 302 [declining to enforce notice clause in insurance contract absent a showing of prejudice to the insurer due to the delayed notice and where insurer was aware of the pending claim].)

Because cases are not authority for propositions not considered (*Howard Jarvis Taxpayers Assn. v. Newsom* (2019) 39 Cal.App.5th 158, 169), we decline to construe these cases as imposing a general rule of liability for defense expenses incurred in a separate or subsequent action from the action in which the insurer wrongfully rejected the insured's defense.

We conclude that the trial court did not err in denying Bartel's claim for damages under a breach of contract (title insurance policy) theory for the " 'donut hole' " period between Composti II and III.

*D. Bad Faith*

Bartel contends the trial court erred in finding Chicago Title not liable for bad faith based on what he characterizes as Chicago Title's "patently unreasonable treatment" of his tender for defense in disregard of California law. (Boldface omitted.) Bartel asserts that the court applied a legally erroneous standard in its phase II determination of bad faith by ignoring the interim judgment's findings on the duty to defend and excusing Chicago Title's failure to conduct a reasonable investigation or acknowledge the possibility of coverage. Chicago Title counters that the trial court applied the correct legal standards and based its determination on substantial evidence that Chicago Title did not act unreasonably given the complexity of the fact pattern concerning the easement, the difficulty of determining which roads were part of the 1970 agreement, and the fact that Composti specifically asserted causes of action that were excluded under the policy.

1. Additional Background

In addition to the stipulated facts and joint exhibits submitted for the phase I trial, the trial court admitted additional evidence and testimony at the phase II bench trial. The trial record includes letters and e-mails between Bartel's counsel and Chicago Title, from each phase of the underlying litigation from March 2011 through March 2017, addressing Bartel's repeated requests for tender and/or reconsideration and the dispute regarding Chicago Title's duty to defend Bartel in the Composti actions. The parties at trial also litigated the issue of damages for the alleged bad faith. Bartel proffered evidence and testified as to the legal fees he incurred during

47

each phase of litigation, tax payments he incurred based on withdrawals he made from his retirement account to fund his defense of the easement claims, and the additional impacts of the litigation (both financial and those related to health, stress, and quality of life).

As relevant to our analysis, we note the following illustrative exchanges between Bartel and Chicago Title concerning the duty to defend. After acknowledging Bartel's initial tender of Composti I in 2011, Chicago Title assigned the claim to claims counsel for investigation and to determine coverage. The assigned claims counsel, Tamar Yellin Schiller, made inquiries to obtain a copy of the title insurance policy (which initially appeared to be missing) and other title and survey documents for the subject properties. In a letter dated July 27, 2011, shortly after Bartel was served in the Composti II action, claims counsel informed Bartel that Chicago Title declined to accept the tender of defense for the matter. The letter stated, as to Composti's allegations and the policy exceptions, that the alleged easement affecting the property is the " 'Lower Road' " and that, after reviewing the 1970 agreement, "[i]t appears that the Lower Road is in fact one of the roads affected by the [a]greement." The letter explained its denial based on the 1970 agreement and its corresponding easements as "excepted from coverage" under the policy's schedule B, as well as the "alternative theories presented by" Composti.

Chicago Title twice reaffirmed its denial in response to Bartel's requests for reconsideration of the tender, reiterating that Composti was seeking an easement across the " 'Lower Road,' " which easement was excepted from coverage based on the 1970 agreement. Chicago Title repeated the same reasoning in its letter dated October 28, 2014, denying tender of the cross-complaint in Composti III. It later accepted tender in May 2015, as of

48

January 19, 2015, based on Composti's assertion "for the first time in the litigation" of an additional basis for a deeded easement based on the Boyd-Sluyter deed. The letter accepting tender explained that Chicago Title "had no duty to defend prior to this time, . . . because the issue of [the] alleged Boyd Deed easement, the only potentially covered matter, was not raised previously."

At the second phase trial, both parties introduced expert witness testimony. The trial court admitted testimony by Bartel's expert witness Hansen on the claims investigation and analysis conducted by Chicago Title, the scope of the insured's defense benefit based on the pleadings and extraneous facts tendered to Chicago Title, the customary standards of good faith claim handling, and the "inconsistency with good faith reasonable claims handling practices of relying on assumptions without investigating the facts related to those assumptions." The court similarly heard testimony from Chicago Title's expert witness Thomas Alborg on the reasonableness of the insurer's investigation.

Additionally, the trial court heard testimony from Bartel, retained real estate appraisers for both sides, an appraisal expert for Chicago Title, Schiller (the claims counsel initially assigned to Bartel's tender of defense of the Composti I and Composti II actions), and Thomas Hayden, senior claims counsel assigned to the claim at the time of trial.

Schiller testified about her receipt of Bartel's initial tender of defense, documentation related to her review of the relevant exhibits attached to the complaint (including "[e]xhibit G," i.e. the Boyd-Sluyter deed), and the process she followed to obtain additional information about the claim. Schiller obtained for her investigation a record of survey from 1970, an assessor's map from 1971, and the assessor's tax parcel map for the period

49

contemporaneous with the 1970 agreement. Schiller also had a 45-minute phone call with Chicago Title's local title manager in an effort to obtain "better firsthand information about what it looks like on the ground." She used satellite imagery from Google Earth to trace what she saw as a road onto a copy of the 1971 assessor's map to identify the road she believed traversed Bartel's parcel and was the subject of the easement claim. Schiller sent a draft of her decision and the underlying documentation to her managing counsel for the region before issuing the rejection of tender to Bartel. Schiller did not retain a local surveyor. She testified that it "didn't seem necessary" given the record of survey and other maps she had obtained.

After receiving Bartel's August 2011 request for reconsideration of the tender, in which Bartel's counsel pointed out that "the status of the roads as provided in the title report is directly called into question by the [Composti] [c]omplaint, and our clients are entitled to be defended and indemnified pursuant to the policy," Schiller drafted a response and sent it to another attorney in the quality assurance group with the relevant background information so the attorney could review her work and make "a fully informed decision." After obtaining the secondary approval, Schiller issued the rejection letter explaining Chicago Title's understanding of the roads and the claim. She wrote, "The Plaintiff [Composti] is incorrect in his mistaken identification of the Lower Road as Fern Flat Road. As you stated, Fern Flat Road indeed lies to the south of the insured property and does not pass through it. Fern Flat Road is a completely different road than the Lower Road. The recorded map referenced in the [c]omplaint clearly shows only Fern Flat Road and the Lower Road–not the Lower and Upper Roads as claimed by [Composti]. . . . The only road of the three (Fern Flat, Upper and

50

Lower) that passes through the insured property is the Lower Road. [Composti]'s obvious mistake does not draw this claim into coverage."

### 2. Legal Principles and Standard of Review

"The law implies in every contract, including insurance policies, a covenant of good faith and fair dealing." (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720.) " 'The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's benefits.' " (*Ibid*.; see *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 (*Egan*).) In other words, it " 'imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose.' " (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 345 (*Chateau Chamberay*).)

"An insurer is said to act in 'bad faith' when it not only breaches its policy contract but also breaches its implied covenant to deal fairly and in good faith with its insured." (*Jordan v. Allstate Ins. Co.* (2007) 148 Cal.App.4th 1062, 1071.) In this context, "the term 'bad faith' is used as "a shorthand reference to a claimed breach by the insurer of the covenant of good faith and fair dealing." (*Bosetti v. United States Life Ins. Co. in City of New York* (2009) 175 Cal.App.4th 1208, 1235.) "An insurer's tortious 'breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself.' " (*Howard, supra,* 187 Cal.App.4th at p. 528.) That is, "an insurer's responsibility to act fairly and in good faith in handling an insured's claim 'is *not* the requirement mandated by the terms of the policy itself—to defend, settle, or pay. It is the obligation . . . under which the insurer must act fairly and in good faith in discharging its contractual responsibilities.' " (*California Shoppers, Inc. v. Royal Globe*

51

*Ins. Co.* (1985) 175 Cal.App.3d 1, 15, quoting *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 573–574.) "In simple terms, an insurer's tortious bad faith conduct is conduct that is unreasonable." (*Howard*, at p. 529.) Reasonableness is an objective standard (*Bosetti*, at p. 1237) and must be evaluated as of the time of the insurer's decisions and actions, not "in the light of subsequent events that may provide evidence of the insurer's errors." (*Chateau Chamberay*, at p. 347.)

"Ordinarily, reasonableness is a factual issue to be decided by a jury." (*Fadeeff v. State Farm General Ins. Co.* (2020) 50 Cal.App.5th 94, 102.) However, the reasonableness of an insurer's conduct "can be decided as a matter 'of law where the evidence is undisputed and only one reasonable inference can be drawn from the evidence.' " (*Ghazarian v. Magellan Health, Inc.* (2020) 53 Cal.App.5th 171, 186–187; accord *Chateau Chamberay, supra,* 90 Cal.App.4th at pp. 346, 350; *Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1424 (*Mt. Hawley*).)

The relevant facts related to Bartel's tender requests and Chicago Title's investigation and denials of tender are neither in dispute nor susceptible to competing reasonable inferences. We therefore review the trial court's determination on Bartel's bad faith claim de novo, and we do not defer to the trial court's determination that Chicago Title did not act in bad faith.

Regarding the legal principles governing Bartel's claim for damages in relation to Chicago Title's alleged breach of the implied covenant of good faith and fair dealing, a finding of bad faith exposes the insurer to a broad range of possible damages. (See *Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 400 ["The availability of tort remedies in the limited context of an insurer's breach of the covenant [of good faith and fair dealing] advances the social policy of safeguarding an insured in an inferior

bargaining position who contracts for calamity protection, not commercial advantage"].)  Such damages include any damages, including attorney fees, that are the proximate result of the insurer's breach of the implied covenant of good faith and fair dealing.  (*Brandt v. Superior Court* (1985) 37 Cal.3d 813, 817 (*Brandt*); see Civ. Code, § 3333.)

The recovery of attorney fees in this context—often called *Brandt* fees—is an exception to the generally applicable rule that parties to a lawsuit must ordinarily pay their own fees.  (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 806 (*Cassim*).)  "[I]f an insurer fails to act fairly and in good faith when discharging its responsibilities concerning an insurance contract, such breach may result in tort liability for proximately caused damages.  Those damages can include the insured's cost to hire an attorney to vindicate the insured's legal rights under the insurance policy.  'When an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense.  The attorney's fees are an economic loss— damages—proximately caused by the tort.  [Citation.]  These fees must be distinguished from recovery of attorney's fees *qua* attorney's fees, such as those attributable to the bringing of the bad faith action itself.' " (*Ibid.*, quoting *Brandt*, *supra*, 37 Cal.3d at p. 817.)

Stated differently, because the "entitlement to attorney fees as compensatory damages is premised on an insured's need to hire an attorney to vindicate his or her contractual rights under an insurance policy" (*Cassim*, *supra*, 33 Cal.4th at p. 807), our high court has "placed a critical limitation on the amount of fees recoverable.  'The fees recoverable, . . ., may not exceed the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract.  Fees attributable to obtaining any portion of

the plaintiff's award which exceeds the amount due under the policy are not recoverable.' " (*Ibid.*, italics omitted.)

To the extent the claimed legal fees for both the contract and tort recoveries are intertwined, the plaintiff bears "the burden of demonstrating how the fees for legal work attributable to both the contract and the tort recoveries should be apportioned." (*Cassim*, *supra*, 33 Cal.4th at p. 813.) Further, "to the extent some overlap in legal work occurs, the trial court should exercise its discretion to apportion the fees" (*id.* at p. 811) to ensure that the *Brandt* fee award reflects only those fees attributable to the attorney's efforts to recover under the breach of the insurance contract. (*Id.* at p. 813.)

Similarly, while noneconomic damages such as for emotional distress are available, those damages must flow from the initial breach of the implied covenant and resulting economic loss. (*Gourley v. State Farm Mut. Auto. Ins. Co.* (1991) 53 Cal.3d 121, 128–129; see also *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1215 (*Major*).)

Whether a party is entitled to a particular measure of damages is a question of law. (*Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 738.)

3. <u>Analysis</u>

Bartel contends that Chicago Title not only breached its contractual duty to defend him in the underlying Composti actions, as established *ante*, but did so unreasonably and in bad faith. Bartel proposes "[t]wo main species of bad faith" by Chicago Title based on its repeated denial of tender: (1) "ignoring the obvious *possibility of coverage* shown by the Boyd[-Sluyter] Deed" and instead relying solely on Composti's allegations in disregard of established law; and (2) failing to conduct a reasonable investigation and relying on assumptions about disputed facts in a manner designed to defeat

54

coverage while ignoring the possibility of coverage that a reasonable investigation would have shown.

We address both contentions together, considering whether the trial court misapplied the law on bad faith by allowing the complexity of the underlying factual and legal issues to serve as an excuse for the insurer's breach of its contractual duty. The trial court correctly identified the governing legal standard for an insurance bad faith claim, stating that the "duty of an insurer to act in good faith is in relationship to the insurer's discharging of its contractual responsibilities" and the "determining factor is whether the insurer acted without proper cause or unreasonably." But the court's analysis does not reflect the degree to which Chicago Title's conduct persistently and unreasonably fell short of its contractual obligation to its insured.

The trial court's inquiry focused largely on the complexity of the fact pattern and difficulty in identifying the roads in the rural property and which may have been included under the 1970 agreement. Even as the court observed that claims counsel "placed an inordinate level of significance upon the Composti [c]omplaint allegations and did not perform the requisite investigation to determine if other factors existed that would confirm/support the duty to defend," the court declined to place "responsibility for this confusion" solely with the insurer.

This approach misconstrued the nature of the insurer's obligation to fairly and in good faith fulfill its contractual duty to defend based on the *possibility* of a covered claim. The trial court effectively conflated Chicago Title's duty to defend with the duty to indemnify. The latter more narrowly applies "to claims that are actually covered, in light of the facts proved." (*Buss*, *supra*, 16 Cal.4th at p. 46.) Contrary to the trial court's conclusion, the

complexity of facts associated with the underlying legal claim and difficulty of ascertaining whether those facts might support a claim under the policy weigh *against* the insurer denying coverage in the manner that occurred here. As our Supreme Court has stated in connection with the duty to defend, "[a]n insurer must defend against a suit even ' "where the evidence suggests, but does not conclusively establish, that the loss is not covered." ' " (*Hartford*, *supra*, 59 Cal.4th at p. 287.) Any doubt must be resolved in favor of the insured (*ibid.*), such that the insurer is excused from defending against a third party claim "only when ' "the third party complaint *can by no conceivable theory raise a single issue which could bring it within the policy coverage*." ' " (*Id.* at p. 288, italics added; see also *Montrose*, *supra*, 6 Cal.4th at p. 300, italics omitted [stating, to prevail in an action seeking declaratory relief on the issue of the duty to defend "the insured need only show that the underlying claim may fall within policy coverage; the insurer must prove it cannot"].)

That coverage depended on uncertain facts related to whether the road traversing the property was one of the unnamed roads subject to the policy exception for the 1970 agreement was itself the type of unresolved factual dispute that " 'would establish a possibility of coverage and thus a duty to defend.' " (*Howard*, *supra*, 187 Cal.App.4th at p. 520.) While Chicago Title was not required to conclusively assess coverage by "figuring out" these details (which both sides recognize took a lengthy trial with conflicting surveyor testimony in the underlying action), it *was* required to accept Bartel's tender unless an adequate investigation demonstrated that the possibility of *any* coverage was precluded. (*Hartford*, *supra*, 59 Cal.4th at p. 288.) Given these longstanding and established principles, Chicago Title's treatment of Bartel's tender request in Composti I and Composti II, requests

for reconsideration, and renewed tender request in Composti III, were objectively unreasonable. In conducting the investigation into Bartel's tender, claims counsel appears to have restricted consideration of the extrinsic facts to their relationship to the 1970 agreement and the allegations of the complaint, rather than examining those facts for the potential liability created by the suit. (See *Gray*, *supra*, 65 Cal.2d at pp. 276–277.)

Chicago Title maintains that substantial evidence in the record supports a finding that claims counsel Schiller conducted an adequate investigation and, in fact, "went far beyond the allegations of Composti's pleadings in attempting to determine the location of the claimed easement and whether that easement was located on one of the 'unnamed roads' shown on the map attached . . . to the [1970 agreement]" and thereby covered by the agreement. We agree that the evidence shows that Schiller investigated the facts that accompanied the Composti complaints by obtaining additional maps and records, speaking with the local title office, and attempting to determine the location of the roads as compared to the 1970 agreement. But Schiller's actions were limited to assessing the operative theory of the complaint and exclusion of coverage. This limited investigation, which precluded the insurer from evaluating whether there was any conceivable theory by which Composti's suit could fall within the policy coverage, cannot establish Chicago Title complied with the fundamental legal principles governing the duty to defend.

Chicago Title asserts that the fact that the trial court reached a different conclusion years later, finding that the easement over the property was not based on the 1970 agreement but on the intent of Boyd as construed through the Boyd-Sluyter and related deeds, does not render Schiller's conclusion or investigation unreasonable. This argument misses the mark.

57

The implied covenant in this context did not require Chicago Title to divine the outcome or speculate as to unpleaded legal theories. Rather, in the face of a claim against the property based on ambiguous maps and road designations, Chicago Title had an implied promise to take reasonable steps to fulfill the expectations of its insured and provide a defense to the claim arising from circumstances conceivably within the scope of the policy. (See *Lambert*, *supra*, 53 Cal.3d at p. 1081 ["[T]he contract of insurance is unique in that the purchaser seeks not commercial advantage, but rather peace of mind and security in the event of unforeseen calamity."].)

The cases that Chicago Title relies on to defeat Bartel's claim of bad faith are distinguishable. Citing *Chateau Chamberay*, Chicago Title suggests that an insurer's denial of or mistaken withholding of policy benefits may be reasonable when based on a genuine dispute involving factual or legal issues. But *Chateau Chamberay*, which involved a homeowners' association direct action against its property insurer to recover for bad faith delay in paying a claim for earthquake damage, is a first party insurer case involving application of the genuine dispute doctrine. (*Chateau Chamberay*, *supra*, 90 Cal.App.4th at p. 346; see *Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 949 [genuine dispute doctrine "holds that an insurer does not act in bad faith when it mistakenly withholds policy benefits, if the mistake is reasonable or is based on a legitimate dispute as to the insurer's liability"].) Numerous state and federal decisions have recognized the genuine dispute doctrine is not compatible with the principles that govern third party duty to defend cases, in which the possibility of coverage triggers the duty. (See, e.g., *Mt. Hawley*, *supra*, 215 Cal.App.4th at p. 1424; *Howard*, *supra*, 187 Cal.App.4th at p. 530; *Harbison v. American Motorists Ins. Co.* (E.D. Cal. 2009) 636 F.Supp.2d 1030, 1040.)

Chicago Title cites *Gunderson* for the proposition that when a lawsuit raises no potential for coverage, the insurer does not have a continuing burden to investigate whether extrinsic facts might bring the claim into coverage. (*Gunderson, supra,* 37 Cal.App.4th at. p. 1114.) However, Composti I not only presented facts creating the potential for coverage, but the insured requested reconsideration of the decision to reject tender by pointing out the very uncertainty (over location and identification of the unnamed roads) that created the possibility of a covered claim.

The reasonableness of Chicago Title's position must also be viewed in context of the timeline of the underlying litigation. (*Pulte Home Corp. v. American Safety Indemnity Co.* (2017) 14 Cal.App.5th 1086, 1119 (*Pulte*) ["The determination of the reasonableness of an insurer's contractual position takes into account not only the rules of contract interpretation (e.g., construing ambiguity in favor of insured), but also the given factual context in which the dispute arises."].) Chicago Title's failure to construe the facts presented by the Composti complaint as requiring it to accept the tender of defense was not an isolated miscalculation but the result of the insurer's persistent but misguided belief that it (1) needed only to ascertain whether the *allegations in the complaint* could result in a judgment that it would be obligated to pay, and (2) had deciphered the location of the unnamed roads referenced in the 1970 agreement to confirm the source of the alleged easement.

In sum, the undisputed facts establish that Chicago Title repeatedly disregarded the California standard applicable to the duty to defend. (See *Howard, supra,* 187 Cal.App.4th at p. 531 [insurer's refusal to defend insured in third-party suit "was founded on an unfair and selective reading of" the facts as falling outside the coverage period]; *Pulte, supra,* 14 Cal.App.5th at

59

pp. 1121–1122 [insurer's claims handling process disregarded known case authority in interpreting its policy].) We conclude that Chicago Title not only violated its contractual duty to defend Bartel but its implied covenant to fairly and in good faith assess the possibility of coverage based on the available facts.

We will therefore reverse the judgment with instructions to the trial court to enter a new judgment holding Chicago Title liable for breach of the implied covenant of good faith and fair dealing. Since the parties on appeal have focused exclusively on the predicate question of the existence of bad faith and have not addressed the evidence presented at trial on damages, we shall remand the matter to the trial court to determine in the first instance, based on the evidence previously admitted at trial, the amount of " ' "any damages which are the proximate result of that breach" ' " (*Brandt*, *supra*, 37 Cal.3d at p. 817) and award them to Bartel.[14]

---

[14] It appears from our review of the record that the damages awarded and/or amounts paid (as some amounts were agreed upon by the parties, not ordered by the trial court) thus far are as follows.

First, based on the duty to defend finding, the interim judgment held Chicago Title "liable for: (1) costs, fees, and interest from March 18, 2011, until October 16, 2012; and (2) interest on fees and costs from after September 5, 2014 that were ultimately reimbursed (without interest) by Chicago Title." On June 28, 2019, pursuant to the interim judgment, Chicago Title made a payment of $102,490.68 (an amount agreed upon by the parties off the record) to Bartel. This amount was in addition to payments made by Chicago Title to Bartel on September 1, 2015 of $62,729.72, on September 1, 2016 of $11,760.50, on May 1, 2018 of $6,339.75.

Next, based on the trial court's findings regarding diminution of value, the court awarded Bartel $230,000, in addition to the $170,000 that Chicago Title had already paid, for a total diminution in value of $400,000. The court awarded prejudgment interest on the $230,000 difference, for a total of $96,284.

On remand, the trial court shall consider the evidence pertaining to both economic and noneconomic damages proximately caused by Chicago Title's breach of the implied covenant of good faith and fair dealing. (See *Major*, *supra*, 169 Cal.App.4th at p. 1215.) The court shall exercise its discretion to apportion any fee award to reflect only those legal fees attributable to Bartel's efforts to recover under the breach of the title insurance contract. (*Cassim*, *supra*, 33 Cal.4th at pp. 811–813.) The court should also address the effect of this reversal on its postjudgment order on the parties' stipulation for costs and amended judgment.

### E. Punitive Damages

Bartel challenges the trial court's denial of punitive damages on grounds similar to those he cites as error in the court's denial of his bad faith cause of action. He contends that clear and convincing evidence in the record supports an award of punitive damages against Chicago Title, which would serve the distinct purpose of deterring future wrongdoing and "discourag[ing] the perpetuation of objectionable corporate policies." (*Egan*, *supra*, 24 Cal.3d at p. 820.) Bartel argues that Chicago Title's "years-long deliberate disregard

---

The trial court otherwise rejected Bartel's additional claim for damages based on Chicago Title's breach of the duty to defend in relation to the " 'donut hole' " period. Because the court rejected Bartel's claim of bad faith, it awarded no damages for Chicago Title's alleged breach of the implied covenant of good faith and fair dealing. It also rejected Bartel's claim for punitive damages.

Lastly, after the entry of judgment, the parties filed a stipulation and proposed order to address Bartel's pending motion to tax costs requested by Chicago Title as well as Bartel's unopposed request for costs. Pursuant to the parties' agreement, the trial court signed the order, in which the parties agreed to an amended judgment. The amended judgment awarded $287,619.52 in favor of Bartel, based on a total judgment of $333,980.62 (including pre- and postjudgment interest), less $43,361.10 in net cost award to Chicago Title.

of controlling California law while waging scorched-earth war against its elderly insured who demanded nothing more than reasonable conduct consistent with the law" is precisely the type of insurance bad faith case for which punitive damages are appropriate.

"In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." (Civ. Code, § 3294, subd. (a).) A plaintiff is never entitled to punitive damages as a matter of right. (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 923.) Rather, "[a] claim for punitive damages requires 'evidence which establishes by "*clear and convincing evidence*" that the defendant has been "guilty of oppression, fraud, or malice." If a plaintiff is to recover on such a claim, it will be necessary that the evidence presented meet this higher evidentiary standard.' " (*Food Pro*, *supra*, 169 Cal.App.4th at p. 994; see Civ. Code, § 3294, subd. (a).)

In the context of failure to properly administer an insurance claim, punitive damages are ordinarily "based on 'malice' or 'oppression,' rather than on the third possible ground for the award, 'fraud.' Both 'malice' and 'oppression' are defined in Civil Code section 3294 as involving 'despicable conduct,' which in the case of malice 'is carried on by the defendant with a willful and conscious disregard of the rights or safety of others,' and as to oppression is 'conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.' " (*Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1286–1287 (*Tomaselli*).) We review de novo whether the undisputed facts underlying Chicago Title's claim handling in

this case satisfy the requirements of Civil Code section 3294, subdivision (a). (See *Ghirardo*, *supra*, 8 Cal.4th at p. 801.)

As explained in our analysis of the duty to defend, *ante*, the trial court correctly determined that the governing principles required Chicago Title, under the terms of the policy, to defend Bartel, as of his initial tender, against the easement claim based on facts inferable from the Boyd-Sluyter deed that gave rise to the possibility of a claim covered by the policy. (*Montrose*, *supra*, 6 Cal.4th at p. 296; *Horace Mann*, *supra*, 4 Cal.4th at p. 1078.) Furthermore, we have determined that the manner in which Chicago Title repeatedly rejected tender in the face of a clear duty to defend amounted to bad faith. Nevertheless, we are not persuaded that Chicago Title's bad faith refusal to defend Bartel under the policy until partway through Composti III rises to the level of malice or oppression within the meaning of Civil Code section 3294.

The heightened legal standard for imposing punitive damages guides our determination. "Under the clear and convincing standard, the evidence must be ' " ' "so clear as to leave no substantial doubt" ' " ' and ' " ' "sufficiently strong to command the unhesitating assent of every reasonable mind." ' " ' " (*Butte Fire Cases* (2018) 24 Cal.App.5th 1150, 1158.) This stringent standard must be accompanied by evidence of " '[m]alice,' " defined as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights . . . of others" (Civ. Code, § 3294, subd. (c)(1)), or " '[o]ppression,' " defined as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights" (*id.*, subd. (c)(2)). " 'Despicable conduct' is conduct that is ' "so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down

upon and despised by ordinary decent people." ' " (*Butte Fire Cases*, at p. 1159.)

Applying these standards, courts have held that " '[p]unitive damages are appropriate if the defendant's acts are reprehensible, fraudulent or in blatant violation of law or policy. . . . Punitive damages are proper only when the tortious conduct rises to levels of extreme indifference to the plaintiff's rights, a level which decent citizens should not have to tolerate.' " (*Tomaselli*, *supra*, 25 Cal.App.4th at p. 1287; see also *Food Pro, supra*, 169 Cal.App.4th at p. 994.) As such, "simple breach of contract, no matter how willful and hence tortious, is not a ground for punitive damages. Such damages are accessible only upon a showing that the defendant 'act[ed] with the intent to vex, injure, or annoy.' " (*Tomaselli*, at p. 1286.)

Without more, Chicago Title's violation of its contractual duty to Bartel and failure to act fairly and in good faith in the discharge of its contractual obligation to defend against the possibility of a covered claim does not demonstrate such blatant or "willful and conscious disregard of" Bartel's rights to constitute malice or oppression. (Civ. Code, § 3294, subd. (c)(1).) The cases that Bartel relies on feature circumstances in which an insurer was found to have acted maliciously in disregard of the rights of its insured to secure the upper hand in settlement or other negotiations (see, e.g., *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 923), deceptively by misleading the insured through the inclusion of erroneous language or standards in the policy (*Moore v. American United Life Ins. Co.* (1984) 150 Cal.App.3d 610, 637), or dishonestly by engaging in a pattern and practice of issuing specified coverage with no intent to honor it (*Pulte, supra*, 14 Cal.App.5th at p. 1126). Having carefully considered the record and evidence at trial, we conclude that, by comparison, Chicago Title's tortious conduct does not meet the

heightened standard for an award of punitive damages. We conclude the trial court did not err in refusing to award punitive damages.

### F. Prejudgment Interest

Bartel challenges the adequacy of the $96,284 in prejudgment interest awarded in the judgment. He contends the trial court abused its discretion by failing to award prejudgment interest on the entire diminution of value amount of $400,000, rather than on only the phase II judgment amount of $230,000. Bartel's argument essentially amounts to a disagreement with the court's finding that Chicago Title's initial payment of $170,000 for diminution in value was not unreasonably delayed.

Bartel also maintains the trial court abused its discretion by selecting a later date for the accrual of interest based on the December 27, 2019 filing of the second amended complaint against Chicago Title, rather than on the filing of Bartel's initial complaint on October 27, 2016. Bartel argues that even under the deferential abuse of discretion standard applicable to this court's review of the trial court's decision on prejudgment interest, the record demonstrates that the court's award was "irrational and arbitrary."

Prejudgment interest " 'provide[s] just compensation to the injured party for loss of use of the award during the prejudgment period—in other words, to make the plaintiff whole as of the date of the injury.' " (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 574 (*Hewlett-Packard*).) Code of Civil Procedure section 3287, subdivision (b), applicable here, "governs cases involving unliquidated contract claims and grants the court discretion to award prejudgment interest from a date no earlier than the filing of the action." (*Hewlett-Packard*, at p. 574.) We review the court's ruling on prejudgment interest under the statute for abuse of discretion. (*Ibid.*) An abuse of discretion occurs when the court's ruling "is 'so irrational

65

or arbitrary that no reasonable person could agree with it.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.) Conversely, we will uphold a court's exercise of discretion " 'if it is based on a "reasoned judgment" and complies with the "legal principles and policies appropriate to the particular matter at issue." ' " (*Hewlett-Packard*, at pp. 574–575, quoting *Bullis v. Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 815.)

Bartel has not persuaded us that the trial court abused its discretion. He asserts that Chicago Title should be liable for prejudgment interest on the $170,000 in diminution of value that the insurer paid on March 27, 2018, because his loss in value began accruing when Composti first began using the property in 2010 and was confirmed in the judgment on Composti III entered on January 23, 2017. He points out that the March 2018 payment of $170,000 came 14 months after entry of the judgment in Composti III, almost 18 months after Bartel filed his lawsuit against Chicago Title, and more than eight years after use of the easement arose as an issue between Composti and Bartel. These facts were before the trial court but did not alter its determination that the payment made by Chicago Title after its diminution valuation of $170,000 "was not unreasonably delayed." Moreover, the court provided a reasoned basis for its decision to award interest on the $230,000 additional diminution value, noting it represented "a significant difference in what was paid versus what was the actual loss."

Apart from arguing that the trial court should have exercised its discretion differently on these facts, Bartel points to nothing in the record that would suggest the court misunderstood the facts or considered improper criteria in making this determination. Nor does Bartel suggest the court was influenced by an erroneous understanding of the applicable law, signaling an

abuse of discretion. (See *Wade v. Superior Court* (2019) 33 Cal.App.5th 694, 709.) Bartel has not offered any basis for this court to conclude that the trial court's decision to award prejudgment interest only on the $230,000 difference in diminution of value damages owed for Chicago Title's breach of contract failed to comport with reasoned judgment or was otherwise arbitrary or capricious.

As to the date of accrual of prejudgment interest, Bartel asserts that his filing of the second amended complaint in December 2019, over three years after his initial complaint, was not substantive in nature and should not have served as the time point to start accruing interest. He argues it was arbitrary for the trial court to tie the accrual date to the filing of that complaint, despite that being the date on which he first included an allegation seeking damages for the claimed diminution in value. Instead, Bartel argues the court should have set the accrual of prejudgment interest "[a]t the very latest" to the date of entry of the Composti III judgment on January 23, 2017.

This conclusory argument, based on Bartel's disagreement with the adequacy of the prejudgment interest award, is insufficient to demonstrate an abuse of discretion. An award of prejudgment interest on an unliquidated contractual claim is discretionary under Code of Civil Procedure section 3287, subdivision (b), including identifying the date from which interest runs, so long as the date does not precede the filing of the action. (*Hewlett-Packard, supra*, 65 Cal.App.5th at p. 574; *North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 829.) Absent any evidence or indication in the record that the court failed to properly exercise its discretion, considered inappropriate factors in making its determination, or exceeded the bounds of reasonable judgment, we conclude the trial court did not abuse its discretion

in awarding prejudgment interest to Bartel based on the difference in diminution of value amount and based on the date of filing of the second amended complaint against Chicago Title.

## III. DISPOSITION

The judgment is reversed. We remand the matter to the trial court with instructions to enter a new judgment holding Chicago Title liable for breach of the implied covenant of good faith and fair dealing. We also remand the matter to the trial court to determine, based on the evidence previously admitted at trial, the amount of "any damages which are the proximate result of that breach" (*Brandt v. Superior Court* (1985) 37 Cal.3d 813, 817) and award them to appellant Bartel. In all other respects, the judgment is affirmed. Bartel is entitled to his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

_____
Danner, Acting P. J.

WE CONCUR:

_____
Lie, J.

_____
Bromberg, J.

**H052083**
***Bartel v. Chicago Title Insurance Company***